625 So.2d 395 (1993)
Oliver Bradford HOPSON
v.
STATE of Mississippi.
No. 90-KA-66.
Supreme Court of Mississippi.
September 23, 1993.
*396 William B. Jacob, Joseph A. Kieronski, Jr., Daniel P. Self, Jr., Self & Jacob, Meridian, for appellant.
Michael C. Moore, Atty. Gen., Deirdre McCrory, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
JAMES L. ROBERTS, Jr., Justice, for the Court:
Oliver Bradford Hopson appeals his conviction of possession of cocaine with the intent to distribute for which he was sentenced to serve thirty (30) years with the Mississippi Department of Corrections, ordered to pay a fine of $50,000.00 plus court costs, and a crime lab fee of $100.00. For the reasons set out below, we affirm the conviction and the sentence.
Hopson asserts six areas of error:
I.
Did the Circuit Court err in failing to grant Appellant a requested jury instruction on the defense of entrapment?
II.
Did the Circuit Court err in ruling that Appellant did not have standing to object to a search and seizure of cocaine from his sister's residence?
III.
Did the Circuit Court err in allowing testimony of Appellant's other alleged related crimes into evidence over a Rule 404(b), Miss.R.Evid. objection?
IV.
Did the Circuit Court err in refusing to grant Appellant's motion to quash the venire panel after unsolicited statements were made by two veniremen during voir dire?
V.
Did the Circuit Court err in overruling Appellant's Motion to Reconsider Sentence for allegedly sentencing Appellant to an excessive sentence?
VI.
Did the Circuit Court err by failing to grant Appellant's Motions for Directed Verdict and for Judgment Notwithstanding the Verdict in that the jury's verdict was against the overwhelming weight of the evidence.

STATEMENT OF THE FACTS
Toni Smith, a.k.a. Wallace Harold Moore, was arrested at the Jackson Municipal Airport on April 26, 1989. His arrest was preceded by a telephone call from an unidentified female to the airport police department at approximately 6:45 a.m. on April 26, 1989. The anonymous informant told the police that the individual in question would be arriving on a flight from Dallas/Fort Worth, gave a description of the individual, including his shoes, his clothing, and the type of suitcase he would be carrying. Based on this tip, Lt. Tucker, the officer on duty, went to the gate of the in-coming flight and confirmed the flight arrival time. The officer watched as a man fitting the description given by the informant got off the flight. The officer followed the individual and observed the individual stop in the main lobby and make a telephone call from a pay phone. *397 The officer continued to follow and observe Smith as he picked up a blue suitcase from the baggage carrousel that matched the color description given by the informant. The officer then observed as Smith went out of the terminal building and asked a cab driver to take him to Meridian. The cab pulled away and the officer got into his marked police car and pursued the cab.
The officer stopped the cab approximately three-tenths of a mile from the terminal building. Smith got out of the cab immediately and went to the back of the police car. The officer instructed Smith to get back in the cab. Smith got back in the cab and began fooling with the suitcase he had in the backseat of the cab with him. At this point, the officer instructed Smith to get out of the cab. The officer asked Smith if the suitcase belonged to him. Smith acknowledged ownership of the suitcase. The officer informed him that he was suspected of trafficking in narcotics. The officer asked Smith if could look into his suitcase, and Smith refused to give consent. The officer told Smith he would have to return with him to the main terminal for further discussion on this matter.
The officer notified the Vice Narcotics section of the Jackson Police Department. When the officers from the Vice Division arrived, Smith was advised of his rights. Smith then consented to a search of the suitcase. Smith was given a consent to search form. Smith signed the form. When the suitcase was searched, the officers found a black plastic shopping bag that contained a U.S. mint cloth bag. Inside the cloth bag was a large ziplock bag that was filled with coffee grounds,[1] as well as another ziplock bag which contained seventeen individually wrapped packages of what appeared to be crack cocaine, roughly sixteen and a half ounces. Detective Iles estimated the street value of the cocaine to be about one hundred to one hundred and twenty thousand dollars ($100,000.00  120,000.00). After the bags of what appeared to be cocaine were found, Smith was placed under arrest for possession with intent to distribute a controlled substance.
Smith decided to talk to the police at this point. He told them that on Saturday, April 22, 1989, he received a telephone call in Los Angeles from a man named Oliver who lived in Meridian, Mississippi. Oliver asked Smith if he wanted to make another run for him. Smith told the police that this was not the first time he had transported cocaine to Mississippi from Los Angeles. Smith then outlined the usual procedure Oliver had him follow in transporting the cocaine. First, Oliver would call Smith and arrange for Smith to meet a black male in Los Angeles from whom Smith would pick up the drugs. Smith would then receive the airfare, either by mail or in person, from whomever delivered the drugs to Smith. Smith would then fly to Jackson, Mississippi, and take a cab from the airport to Meridian and meet Oliver Hopson.
Smith said he would usually be paid fourteen hundred dollars ($1400.00), but on this occasion, he was to be paid fifteen hundred dollars ($1500.00). Smith told the officers that he was following the usual plan on this occasion. He had received the drugs from a black male in Los Angeles and had taken the drugs back to the motel room where he was staying. He also received $700.00 with which he bought his airline ticket to Jackson. He left Los Angeles shortly after midnight on April 26, 1989. Smith told the officers that the plan was for him to call Hopson and, at that point, a determination as to the place they would meet would be made.
The officers decided to try to verify Smith's story. They contacted the Meridian Police Department Narcotics Division to confirm Smith's story. The officers involved decided to conduct a controlled delivery and Smith agreed to fully cooperate. Smith told the officers that he thought he would meet Hopson at a house described as a big green house on Old Marion Road, and described for the officers how to get there. Smith told the officers this particular house was Hopson's sister's house.
*398 The officers took Smith and met with the officers from the Meridian Police Department at the Holiday Inn in Meridian. From that motel room, Smith placed two telephone calls. First, Smith called a female, asked to speak with Hopson, and was told that Hopson was not there. Second, Smith contacted Hopson directly. Smith explained that his cab had broken down and that was why he was running late. This telephone call was recorded by the officers.
Some of the officers left at that point to locate the house in question and did in fact locate the house at 1902 Old Marion Road, Meridian. The other officers placed a body transmitter in the suitcase Smith had used to carry the drugs on the plane. One officer drove a cab. The plan was for the officer to act as a cab driver, drive Smith to meet Hopson at the designated house, and Smith would go into the house and ask for money with which to pay the cab driver. Smith would then come out of the house and tell the officer how many people were inside and whether or not there were any weapons present. Everything went according to plan. Smith came out to the cab and told the officer that Walter [Reed] was in the house with Hopson. The officer in the cab pulled away and waited at a bank approximately two blocks from the house.
Two of the other officers involved in the investigation parked near the house, about two and a half blocks away. They listened to the transmitter that had been placed in Smith's suitcase. Their purpose was to listen and make a determination when to direct the other officers to go into the house. Although a recording was to be made of any conversation within the residence, the tape recorder malfunctioned and a recording was not made. From the transmission of the conversation within the residence, the officers heard Smith ask for money for cab fare. They also heard what was thought to be Smith producing the package of cocaine for Hopson,[2] and Smith asking to be paid the money that he expected to be paid. The other voice indicated that he had Smith's money but was not going to pay him right away. That was the signal for the officers to begin their entry into the house, which they did.
Upon entering the house, the officers observed Smith standing nearest the front door beside the suitcase, which was open on the floor. There were two black males that began running to the rear of the house when the officers entered the house. The officers then identified themselves as police officers, and ordered that all three of the men get down on the floor. Smith went immediately to the floor. The other two males, one identified as Hopson, turned toward the further end of the dining room, and was seen with a package in his hand. Hopson was observed throwing the package into the washer or dryer sitting near the rear door of the house. Hopson then ran into a bedroom. Another of the officers found Hopson on his stomach on a bed with his hands going under the pillows on the bed. The officer identified himself again, and told Hopson to stop and put his hands on the top of his head. The officer frisked Hopson and found a large roll of money in his pockets. There were no weapons found on Hopson at that time.
The officers searched the house. Approximately thirteen hundred and eighty dollars ($1380.00) was found behind the chest of drawers in the same room where Hopson had been found. The two suspects, Hopson and Reed, were taken into custody by the officers. The package was then retrieved from the washing machine. It was the package that had been prepared by the officers, containing both the real cocaine and the dummy bag.
At the preliminary hearing, Toni Smith recanted his version of what happened, and claimed that Hopson had nothing to do with the cocaine. When Smith testified at Hopson's trial, he was called as a witness for the State, but was eventually treated as an adverse witness due to the differences in the statements he had given at the time of his arrest, and what he claimed to be the truth at trial. Smith claimed that because of how *399 much trouble he was in, he made up the story about working for Hopson to "help himself." Smith claimed that Hopson was only expecting him to bring marijuana for Hopson's own personal use, and was not expecting any cocaine. Smith maintained that he was planning to sell the cocaine himself on the streets of Meridian.
The State's position during the trial was that since Hopson, Reed and Smith were in the same jail for a period of time, Hopson was able to "get to" Smith and frighten him into changing his story. The State had Smith moved to another jail after he recanted at the preliminary hearing.

DISCUSSION OF THE ISSUES

I.

The Circuit Court correctly denied the requested jury instruction on entrapment.
Entrapment has been defined as "the act of inducing or leading a person to commit a crime not originally contemplated by him, for the purpose of trapping him for the offense." Phillips v. State, 493 So.2d 350, 354 (Miss. 1986) (quoting McLemore v. State, 241 Miss. 664, 675, 125 So.2d 86, 91 (1960)). The defense of entrapment is affirmative and must be proved by the defendant. Bush v. State, 585 So.2d 1262 (Miss. 1991). If the defendant already possessed the criminal intent, and the request or inducement merely gave the defendant the opportunity to commit what he or she was already predisposed to do, entrapment is not a defense. Id. at 1264.
Hopson raised the affirmative defense of entrapment at the beginning of his trial and maintained throughout the proceedings that he was entrapped. He also maintained throughout the proceedings that he was innocent of the charges brought against him. Although the trial court recognized that Hopson was raising the entrapment defense, it refused to allow the issue to go before the jury after all the evidence was presented. The trial court did this because of the well-established rule in Mississippi that in order for one to use the affirmative defense of entrapment, one must admit that he or she committed the alleged offense. Howard v. State, 507 So.2d 58, 62 n. 1 (Miss. 1987); Daniels v. State, 422 So.2d 289, 291 (Miss. 1982); Pace v. State, 407 So.2d 530 (Miss. 1981).
In Mississippi, in order for a defendant to invoke the defense of entrapment, "it must necessarily be assumed that the act charged as an offense was committed. [Citations omitted.] Entrapment as a defense is not generally available if the accused denies the offense with which he is charged." Reeves v. State, 244 So.2d 5, 6 (Miss. 1971). In a long line of cases, this Court has held that a defendant cannot deny a criminal act and claim entrapment. E.g., Howard, 507 So.2d at 62; Daniels, 422 So.2d at 291; Pace, 407 So.2d at 532; Landers v. State, 304 So.2d 641, 643; McCormick v. State, 279 So.2d 596, 597 (Miss. 1973).
The United States Supreme Court addressed the issue of whether a defendant in a federal criminal prosecution who denies the commission of the crime may nonetheless have the jury instructed, where the evidence warrants, on the affirmative defense of entrapment. Matthews v. United States, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988).
In Matthews, the defendant filed a motion in limine seeking to raise the entrapment defense. The District Court denied the motion because an entrapment defense was not available to a defendant who would not admit all of the elements of the offense charged. At the close of the trial, the defendant moved for a mistrial based on the District Court's refusal to instruct the jury as to entrapment. The District Court said that the evidence of entrapment was shaky, but based its denial of the entrapment instruction on the defendant's refusal to admit committing all the elements of the crime. Id. at 61-62, 108 S.Ct. at 885-886. The Seventh Circuit upheld the District Court's refusal to grant a jury instruction in such a situation. Id. at 62, 108 S.Ct. at 886. The United States Supreme Court reversed the case and held that "even if the defendant denies one or more of the elements of the crime, he is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment." Id.
*400 The history of not allowing a criminal defendant to plead affirmatively that he did not commit the crime, yet was entrapped, comes from the notion that a criminal defendant should not be allowed to plead inconsistently. However, inconsistent pleadings are not unheard of in the criminal context. For example, instructions both on the offense being prosecuted, and the lesser included offense are often granted, i.e. to claim self-defense is inconsistent with a claim that one killed in the heat of passion, but jurisdictions allow both to be pled. Id. at 64, 108 S.Ct. at 887. As the United States Supreme Court found in Matthews, "[w]e are simply not persuaded ... that we should make the availability of an instruction on entrapment where the evidence justifies it subject to a requirement of consistency to which no other such defense is subject." Matthews, 485 U.S. at 66, 108 S.Ct. at 888.
In United States v. Ivey, 949 F.2d 759 (5th Cir.1991), cert. denied, Wallace v. United States, ___ U.S. ___, 113 S.Ct. 64, 121 L.Ed.2d 32 (1992), the Fifth Circuit addressed this issue. In Ivey, the defendant had requested a jury instruction on the defense of entrapment, but the trial judge denied the request on the grounds that such defense was not available to a defendant as long as he or she denied committing the crime. Ivey noted the change in the law since Matthews: "[t]he Supreme Court now would permit a Defendant to assert entrapment while denying any or all elements of the crime, including intent." Id. at 768. However, Ivey went on to note that while the trial judge was in error as to the reason he refused to give the requested entrapment instruction, there remained a question as to whether failing to give the instruction was an error. The Fifth Circuit concluded that it was not. Id.
Before a defendant can raise the defense of entrapment, he or she is required to show evidence of government inducement to commit the criminal act and a lack of predisposition to engage in the criminal act prior to contact with government agents. United States v. Cantu, 876 F.2d 1134, 1137 (5th Cir.1989) (citing Matthews, supra; United States v. Jones, 839 F.2d 1041 (5th Cir.), cert. denied, 486 U.S. 1024, 108 S.Ct. 1999, 100 L.Ed.2d 230 (1988)). See also United States v. Collins, 972 F.2d 1385, 1413 (5th Cir.1992) (jury instruction on entrapment to be given when there is sufficient evidence from which a jury could reasonably find entrapment, even if the defendant denies culpability); United States v. Evans, 924 F.2d 714, 716 (7th Cir.1991) (if evidence is such that a rational jury could infer that defendant was entrapped into committing the crime of which he was convicted, defendant was entitled to jury instruction on entrapment).
Notwithstanding the well-established rule in Mississippi that a defendant must admit the offense with which he or she is charged before being permitted to submit an entrapment instruction to the jury, we now abolish that requirement and will follow the rule announced in Matthews and followed by the Fifth Circuit.[3]
However, although the rule in Mississippi will hereinafter not bar a defendant from asserting entrapment if he or she denies any or all of the elements of the offense, this does not provide any relief for Hopson. As noted above, there are two requirements to successfully raise entrapment as a defense: first, proof of government inducement to commit the criminal act or acts; and second, that the defendant lacks the predisposition to commit the criminal acts. Matthews, 485 U.S. at 62, 108 S.Ct. at 886. See also Phillips, 493 So.2d at 354. This is not the situation here. The evidence clearly shows *401 that there was no government inducement of Hopson to commit this crime. In fact, the government agents stumbled into the criminal act as it was in progress. Moreover, there is sufficient evidence to show that Hopson was predisposed to commit the alleged offense, as there was evidence that this was not the first time he had drugs brought in from California for sale in Mississippi.
Therefore, based on the foregoing, we find that the trial court did not err in denying Hopson's request for an entrapment instruction.

II.

The Circuit Court correctly ruled that Hopson had no standing to object to the search and subsequent seizure of cocaine from his sister's residence.
Hopson filed a pre-trial motion to suppress evidence seized from the house at 1902 Old Marion Road, Meridian, Mississippi. This house was the rented residence of Hopson's sister, Barbara Clark. During the suppression hearing, Barbara Clark testified that Hopson stayed with her approximately one day a week to help with the babysitting of her children. Ms. Clark testified on cross-examination that her brother lived in Toomsuba, Mississippi, with their mother, not at the house located on Old Marion Road in Meridian. Furthermore, she testified that there was only one key to her residence at 1902 Old Marion Road, and that Hopson was not in possession of that key. She further stated that Hopson did not "come and go" as he pleased at her residence. She emphatically stated that Hopson did not live there.
After hearing this single witness called in support of the motion to suppress, the Court found that there was clear and convincing proof that Hopson was nothing more than a visitor at his sister's home and did not have any recognized expectation of privacy under the Fourth Amendment that would give standing to object to the search.
Among the cases Hopson cites in support of his argument that Hopson should be granted standing in this case, there are three that have been specifically overruled, including two from this Court. The cases from this Court are Canning v. State, 226 So.2d 747 (Miss. 1969), overruled by White v. State, 571 So.2d 956, 960 (Miss. 1990); Fuller v. State, 230 So.2d 213 (Miss. 1979), overruled by White, supra. Also cited was Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960), overruled by United States v. Salvucci, 448 U.S. 83, 100 S.Ct. 2547, 65 L.Ed.2d 619 (1980).
The facts in White are similar to the case sub judice. In White, the defendant was a suspect in a burglary case. The police went to the defendant's girlfriend's apartment. The girlfriend told the officers that the defendant came to see her occasionally and sometimes spent the night. The defendant did not have a key to the apartment, exercised no control over the premises, and was there only because the girlfriend gave her permission. This Court upheld the Circuit Court's ruling that the evidence seized was admissible, finding that the defendant lacked standing to object to the search of his girlfriend's apartment because he did not have a reasonable expectation of privacy in the premises. Id. 571 So.2d at 958. This Court cited Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) for the proposition that "[t]he proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." White, 571 So.2d at 959 n. 2.
Hopson was a guest, and only a guest in his sister's home. At no time did he have control over the premises to such a degree that he would have an expectation of privacy that would invoke his right to object to the search and subsequent seizure of contraband pursuant to the Fourth Amendment. The testimony is straightforward. Hopson resided elsewhere; he did not possess a key to the house; and he did not have permission to have the run of the place. In fact, the familial relationship aside, he was little more than a babysitter. Hopson's second assignment of error is without merit.

III.

The Circuit Court properly admitted evidence, over Rule 404(B) objection, of the *402 Hopson's prior drug-related conduct to show predisposition to commit the alleged offense.
The defense objected at trial to the State's introduction of Hopson's prior drug-related conduct. The defense based its objection on Miss.R.Evid. 404(b). There was a lengthy exchange between the court and counsel outside the hearing of the jury. Based on this exchange, the trial court overruled the objection. The court did so based on the principle that once a defendant has raised entrapment as a defense, the defendant places his or her predisposition to commit the crime charged at issue. The trial court further found "that it's a material element under this factual situation that proof of motive, opportunity, intent, preparation, plan, knowledge, and absence of mistake or accident are viable issues in this case due to the defense raised by the defendant." See Darby v. State, 538 So.2d 1168 (Miss. 1989); Sayre v. State, 533 So.2d 464 (Miss. 1988).
Hopson now counters that to allow the State to introduce evidence of predisposition, yet deny the defense an entrapment instruction, gave the State an unfair advantage. Sayre addresses this issue. It is not the ultimate outcome of whether or not a defendant is able to successfully establish a prima facie case of entrapment, but rather the raising of such a defense that opens the door for the prosecution to introduce evidence of predisposition to commit the offense. Sayre, 533 So.2d at 466-467. See also Tanner v. State, 566 So.2d 1246, 1248 (Miss. 1990) (once a defendant makes out a prima facie case of entrapment, evidence of predisposition is relevant and always admissible); Moore v. State, 534 So.2d 557, 558 (Miss. 1988) (plurality opinion) ("Where entrapment is pled as a defense, evidence of predisposition is always relevant, hence, always admissible.").
Based on the law as it was announced in Sayre, the objection to the admission of Hopson's prior drug-related activities was properly overruled, as these activities showed Hopson's predisposition to commit the alleged offense. This assignment of error is without merit.

IV.

The Circuit Court correctly held that the unsolicited comments of two potential jurors did not require that the entire venire be quashed.
Hopson's next assignment of error involves the voir dire process. During voir dire, two potential jurors made unsolicited comments in response to the following defense question:
[BY DEFENSE COUNSEL] So is there anything, no matter what it might be, that comes to mind to you that would tend to influence your decision in this case other than the law as the Judge provides it to you, and the testimony that comes from this witness stand?
Mr. Sturges, one of the veniremen, raised his hand, and answered:
I'm hung up on your presentation to tell the truth. You never mentioned how much cocaine. My question is how much cocaine and how many people died from that cocaine  is my question.
Another of the potential jurors also asked to say something at this time:
My name is Betty Manley. I've waited for many years to be called for jury duty. When I received my summons I was thrilled to death to finally be called for jury duty, but I have been sitting here very patiently this morning, because I was thrilled to death. But this morning, I am very upset with what has gone on here. I beg to be let out of jury service now. You, sir, have talked to us like we are immature children. It was me clapping back here and I realize now I was out of order. I apologize for that, but I do not wish to serve. If I served on your jury, because of you, I would find that person 
BY THE COURT: All right. Mrs. Manley 
A.  guilty because I 
BY THE COURT: Mrs. Manley.
A. I'm sorry. I shouldn't have said it.
BY THE COURT: Yes, ma'am. You shouldn't have. I will ask you to please be seated. Mr. Jacob is performing his duty as he understands it.
*403 The trial court went on to explain that this was the way the legal process works, and asked that the veniremen have patience and please give Mr. Jacob their attention.[4] Also, the panel was specifically asked by defense counsel if anyone else felt the way Mrs. Manley felt. There was no response.
At the conclusion of the voir dire, defense moved to have the entire panel quashed because the comments of the two veniremen tainted the entire venire. The State argued that because of the follow-up question by Mr. Jacob regarding whether any of the other veniremen felt the same and there being no response, the venire should not be quashed.
The Court denied the motion based on the questions that were asked. The Court interpreted Mrs. Manley's comments to be based more on how much time had been taken and the fact that she did not like that. The Court found that Mr. Sturges, the other venireman that spoke out, was merely expressing an opinion. Furthermore, the Court pointed out that there was a reason that each side had strikes that could be used; and in this case, both of the veniremen in question were stricken for cause.
In Benson v. State, 551 So.2d 188 (Miss. 1989), a similar situation arose. During voir dire, one of the veniremen told the assistant district attorney in the presence of the other veniremen that he had read a brief sketch of the defendant in the newspaper and that it had said the defendant was a habitual offender. The prosecutor asked the prospective juror if he could disregard what he read and decide the case on the basis of the evidence presented during the course of the trial. The potential juror responded that he could. The trial court followed this up by asking all the members of the venire panel if they would be influenced by what that venireman had said he had read in the newspaper, or by the fact that such information had been published in the newspaper. There was no response from the venire panel. The trial court then overruled the defense's motion for a mistrial and a new jury panel. This Court affirmed the lower court's decision. Moreover, in Robinson v. State, 253 So.2d 398 (Miss. 1971), this Court said that where the voir dire given by the court clearly disclosed that "no juror felt or believed that the statement made ... would prejudice him or prevent him from being a fair and impartial juror," the matter was left in the discretion of the court. Id. at 400.
Benson clearly applies to this case. In both cases there were improper comments from a potential juror, and in both cases, the follow-up questions revealed that there was nothing to indicate that the venire panel had been biased, prejudiced or would be less than fair in discharging its duty by what had occurred. See West v. State, 463 So.2d 1048, 1054 (1985). Furthermore, once the trial judge is satisfied that the potential jurors are without prejudice that would prevent them from being fair and impartial jurors, it is within the discretion of the court to make the final determination as to whether the panel should be quashed. Robinson, 253 So.2d at 400.
The State posits that this issue is not properly before this Court because the defense did not make a timely objection to the unsolicited comments by the potential jurors. Moreover, the State believes the trial court went beyond the call of duty by admonishing the veniremen sua sponte, thereby remedying the situation.
In all fairness to the defense, there was not much of an opportunity to object before the court itself reacted with its particular form of damage control. The trial court's admonishment should have remedied any prejudicial effect the comments may have left in the minds of the veniremen. See Davis v. State, 530 So.2d 694 (Miss. 1988).
Based on the foregoing reasons, this assignment of error is without merit.

V.

The Circuit Court correctly overruled Hopson's Motion to Reconsider Sentence and did not give him an excessive sentence.
*404 The trial court entered a corrected sentencing order on November 28, 1989, against Hopson. The court sentenced Hopson to thirty years with the Mississippi Department of Corrections at Parchman, Mississippi. Hopson was also ordered to pay a fine of $50,000.00, court costs of $2,592.00, and a crime lab fee of $100.00. This sentence was authorized under Miss. Code Ann. § 41-29-139(b)(1) (Supp. 1989). It should be noted at the outset that Hopson, being a nonrecidivist, is eligible for parole.
Hopson filed a Motion to Reconsider Sentence. Attached to the Motion was a copy of a sentencing order for Toni Smith who had been sentenced in the Circuit Court of Rankin County to serve thirty years and pay a fine of $1,000.00. The last twenty years of the sentence and payment of the fine were suspended upon the meeting of certain conditions set forth in his sentencing order.
Hopson's contention is that in light of Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), questioned in Harmelin v. Michigan, ___ U.S. ___, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991) and the Federal Sentencing Guidelines, his sentence is disproportionate to his crime and should be reversed.
Mississippi has not adopted the Federal Sentencing Guidelines, and therefore further discussion is unnecessary on Appellant's contention that the Guidelines have been violated.
In Solem, the United States Supreme Court set out three factors for courts to consider when conducting a proportionality analysis:
(a) gravity of the offense and the harshness of the penalty;
(b) sentences imposed on other criminals in the same jurisdiction; and
(c) sentences imposed for the commission of the same crime in different jurisdictions. 463 U.S. at 292, 103 S.Ct. at 3010.
The issue of disproportionate sentencing was recently revisited by the United States Supreme Court in Harmelin v. Michigan, ___ U.S. ___, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991). In a nonmajority section of Harmelin, Justice Scalia stated that the Court's earlier holding in Solem that a criminal sentence must be proportionate to the crime for which the defendant has been convicted was "simply wrong," and the Eighth Amendment does not contain a proportionality guarantee. Harmelin, ___ U.S. at ___, 115 L.Ed.2d at 846. However, a majority of the Court in Harmelin refused to extend the proportionality requirement or the individualized sentencing scheme applicable in capital cases to Eighth Amendment cases, affirming a statutorily mandated sentence of life imprisonment without parole for possession of cocaine.
However, even though Harmelin questions the proportionality analysis, there is language in the case to indicate that a "gross proportionality" analysis is still in order. Harmelin, ___ U.S. ___, 111 S.Ct. 2680, 115 L.Ed.2d at 871.
The United States Supreme Court has specifically said "that for crimes concededly classified and classifiable as felonies, that is, as punishable by significant terms of imprisonment in a state penitentiary, the length of the sentence actually imposed is purely a matter of legislative prerogative." Rummel v. Estelle, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980).
This Court has held that "when sentences are within the limits of the statute, the imposition of such sentences is within the sound discretion of the trial court and this Court will not reverse them." Presley v. State, 474 So.2d 612, 620 (Miss. 1985) (citing Boyington v. State, 389 So.2d 485 (Miss. 1980)). However, this Court has also said it will review a sentence where it is alleged that the penalty imposed is disproportionate to the crime charged. Fleming v. State, 604 So.2d 280 (Miss. 1992). See also Ashley v. State, 538 So.2d 1181, 1184-1185 (Miss. 1989).
Applying the facts of this case to the criteria outlined in Solem, Hopson's sentence is not disproportionate to the offense he was found guilty of committing. First, the offense of possession of cocaine is serious, especially when the amount of cocaine possessed was such that Hopson intended to distribute it. See generally Harmelin, ___ U.S. ___, 111 S.Ct. 2680, 115 L.Ed.2d at 870-871. Second, the defense used Toni *405 Smith as an example of the type of sentence Hopson should have received. Smith's sentence is irrelevant to any discussion on Hopson. Smith was merely a courier, and furthermore, did cooperate in the beginning with the investigation. Third, in a short perusal of other jurisdictions, thirty years for possession of cocaine with a street value of $100,000.00 is not disproportionate. After all, Hopson will be eligible for parole. See, e.g., Hale v. State, 600 So.2d 1228 (Fla. 1992) (two 25-year habitual violent felony offender sentences, each with mandatory 10-year minimum sentences to run consecutively, for sale and possession of a small amount of crack cocaine, did not constitute cruel and unusual punishment); State v. Fairchild, 829 P.2d 550 (Idaho App. 1992) (sentence for first offense to 25-year sentence, with 12-year mandatory term, for possession of cocaine, a five-year fixed term for possession of marijuana, and fines of $25,000.00 and $10,000.00 was not excessive); Donahoo v. State, 552 So.2d 887 (Ala.Cr.App. 1989) (twenty-year sentence and $25,000.00 fine for trafficking in cannabis was not disproportionate to crime and was within Constitutional limits).
Hopson's contention that his sentence was excessive and constituted cruel and unusual punishment is without merit.

VI.

The Circuit Court properly denied Hopson's Motions for Directed Verdict and For Judgment Notwithstanding the Verdict for the jury's verdict was not against the weight of the evidence.
Hopson contends that the verdict of the jury was not based on the evidence presented but rather was biased, prejudiced and sympathetic toward the State. Hopson erroneously alleges that there was uncontradicted evidence that Toni Smith was an agent for the State merely to attempt escape, and that the investigators had to make an extensive effort to even find the address of Hopson. Hopson's contentions are contradicted by Smith himself, through the statements he made at the time of his arrest, the statement that he signed a few days later, and the statements he made at the preliminary hearing after being in the same jail with Hopson and what he later said at Hopson's trial.
This Court has stated that all evidence, including that which does not support the State's case, must be considered in the light most favorable to the State as verdict winner. Burge v. State, 472 So.2d 392, 393 (Miss. 1985). Furthermore, the State must be given the benefit of all favorable inferences that may reasonably be drawn from the evidence. Glass v. State, 278 So.2d 384, 386 (Miss. 1973). "We may reverse only where the evidence is such that reasonable and fair-minded jurors could only find the defendant not guilty. [Citations omitted.]" Heidel v. State, 587 So.2d 835, 838 (Miss. 1991).
The verdict of the jury viewed in the light most favorable to the State is supported by the evidence. There is an informant that specifically identified the courier. The courier outlined a detailed description of the usual operation with Hopson including the use of motels, pay phones, the people he met in connection with furthering the transport of the cocaine, and the name and an approximate address of his "boss." The courier was then put into the role of cooperating with the police; but only to the extent that he was continuing with a plan that was not contrived by the police, but rather, a plan that was already set before the police got involved with the case. There was also a listening device that alerted the officers when to make a move, that is, at the mention of money to be paid for the service Smith provided. At no time was there any hesitation, nor surprise on Hopson's part, when Smith delivered to him a suitcase containing cocaine, and Hopson did mention money. There was in fact close to the $1500.00 Smith said was to be his fee found on Hopson's person and hidden in the house.
The verdict of the jury is supported by the weight of the evidence. This assignment of error is without merit.
Hopson's conviction of possession of cocaine with the intent to distribute and sentence of thirty years imprisonment is affirmed.
CONVICTION OF THE POSSESSION OF COCAINE WITH INTENT TO DELIVER *406 AND SENTENCE OF THIRTY (30) YEARS IN THE MISSISSIPPI DEPARTMENT OF CORRECTIONS AND PAY A FINE OF $50,000.00, AFFIRMED.
HAWKINS, C.J., PRATHER, P.J., and PITTMAN, McRAE and SMITH, JJ., concur.
DAN M. LEE, P.J., concurs in results only.
BANKS, J., dissents with separate written opinion joined by SULLIVAN, J.
BANKS, Justice, dissenting:
The majority correctly abolishes the rule we reiterated in Howard v. State, 507 So.2d 58 (Miss. 1987), and adopts the approach enunciated in Mathews v. United States, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988), with regard to entrapment. I must dissent, however, because the majority fails, in my view, to recognize the distinction between evidence in support of a conclusion and evidence compelling a conclusion to the exclusion of other results when it applies the new rule to the facts of this case.
The trial court took great pains to make a clear record that the basis for its rejection of the proffered entrapment instruction was the failure of Hopson to admit knowingly taking possession of the drugs in question. The clear inference from the instruction colloquy with counsel is that, were it not for the rule which we today jettison, the instruction would have been granted. That colloquy is as follows:
BY THE COURT: What says the State with respect to D-2?
BY MR. ANGERO: Your Honor, this is, I suppose, allegedly an entrapment instruction. The defendant, it's my understanding, is not admitting possession of any controlled substance. Under the law stated in Moore v. State, [534 So.2d 557 (Miss. 1988)] ... we do not believe that it's appropriate to allow the defendant to claim multiple defenses in an entrapment case, which apparently is what their intent is. . ..
BY THE COURT: All right. For the record, let the Court make this statement. The Court has ruled previously and still maintains the position that the defendant in this case is not entitled to deny possession of cocaine and maintain an affirmative defense of entrapment. The defendant has informed the Court that they are going to maintain that they were not in possession of the cocaine and for that reason, this court will not grant any entrapment instructions... . [D]oes the defendant agree that you maintain your innocence on the possession charge? Is that correct?
BY MR. JACOB: That is correct. We are maintaining the position that both positions are consistent one with the other.
BY THE COURT: All right. I understand that, but I wanted the record to be clear why entrapment instruction was not going to be given. (emphasis by appellee).
It follows that the state's argument in support of the decision of the trial court rests entirely on the rule stated in Howard v. State, 507 So.2d 58 (Miss. 1987), precluding an entrapment defense where one does not admit guilt.
To say conclusively, as the majority does, that the government "stumbled into a criminal act" involving Hopson, is to accept as fact a statement made by Smith pre-trial, the truth of which he denied at trial. That is, the fact that Smith was involved in criminal conduct is uncontested. The evidentiary basis for Hopson's involvement prior to state intervention is for the most part Smith's statement. That statement, as a pre-trial unsworn statement, is admissible only for impeachment and not as substantive evidence. See, Miss.R.Evid. 613 and 801(d)(1)(A) and Comment, Rule 801. Confusion on this issue is the only explanation for the majority assertion that there is "evidence that this was not the first time he [presumably Hopson] had drugs brought in from California for sale in Mississippi." The fact is that there is no such evidence. Smith's pre-trial statement is the only indication that this is so.
Once Smith was intercepted, he was clearly under the control of the state and his actions thereafter must be viewed as the *407 actions of the state. His delivery of cocaine to Hopson is attributable to the state and surely is evidence supporting a verdict of state inducement.
The majority notes that there is evidence to show that Hopson was predisposed to commit the crime. That is but a preliminary question. Another essential question to our inquiry is whether a reasonable jury would conclude that Hopson was not predisposed to commit the particular crime in question, and would not have done so had the government not accepted the word of Smith and used Smith to place the offending substance in his hands. Although the majority erroneously relies upon Smith's pre-trial statement, it must be acknowledged that there is other evidence. There were the taped conversations concerning a "package". There is the fact that Hopson did not sound surprised to hear from Smith. There is enough, perhaps, that we would find unassailable a jury verdict rejecting the entrapment defense. That this is so, fails to answer the question whether the jury should have been allowed to consider the matter.
Entrapment is a jury issue. Moore v. State, 534 So.2d 557 (Miss. 1988). Once a prima facie case is made the burden of proof is upon the state to prove predisposition. Ervin v. State, 431 So.2d 130, 133 (Miss. 1983). Here the prima facie case is established by Smith's testimony that Hopson expected no cocaine, together with the uncontroverted fact that cocaine delivered by Smith and the delivery itself was in the control of the state. The clear fact is that no matter what Smith's status was before he was intercepted, thereafter, he became as fully an agent of the state as any other informant to whom contraband is supplied for delivery. See, e.g., Tanner v. State, 566 So.2d 1246 (Miss. 1990).
Smith, at trial, contended that Hopson expected no cocaine from him. He testified that he was to give Hopson marijuana and that he alone would distribute the cocaine. He claimed that he named Hopson only in an effort to get himself into a position where he could escape. That Smith is probably not worth of belief is not a determination to be made by this Court in the first instance. Predisposition is a factual issue to be decided by the jury. There was disputed evidence for jury resolution. I would reverse because the trial court failed to allow the jury to decide that issue.
SULLIVAN, J., joins this dissent.
NOTES
[1] Coffee grounds are used by drug traffickers because they mistakenly believe that the drug detection dogs used by the police will not be able detect the odor of the illegal drugs through the coffee grounds.
[2] The officers heard Smith say, "[h]ere is the package." The other voice said something to the effect that it was a good package.
[3] Some states have specifically declined to follow Matthews in eliminating the admission of the elements of the offense charged before allowing a defendant to submit a jury instruction on entrapment. E.g., State v. Abrams, 164 Ariz. 185, 186, 791 P.2d 1068, 1069 (App. 1990), aff'd sub nom., State v. Soule, 168 Ariz. 134, 811 P.2d 1071 (1991) (specifically refused to overrule Arizona law, finding that to allow a defendant an entrapment instruction without his admitting all elements of the offense charged would tend to increase the risk of perjury); Morris v. State, 300 Ark. 340, 779 S.W.2d 526, 527 (1991) (the state supreme court stated that it was not bound to follow Matthews because the case involved the construction of federal procedural law and that furthermore, in the case before the court, there was no evidence from which the court could have found entrapment).
[4] Specifically, the court said:

This is the way the legal process works. This is the procedure we're going to follow... . That's what the law says and that's the procedure we must follow. I understand each of your individual situations, but I will ask your patience and your attention to Mr. Jacob. Thank you. All right. Let's continue.