# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2024-KA-00090-COA

**REBECCA LYNN BUMGARDNER A/K/A**          **APPELLANT**
**REBECCA BUMGARDNER A/K/A REBECCA L.**
**BUMGARDNER**

**v.**

**STATE OF MISSISSIPPI**          **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 05/26/2023 |
| TRIAL JUDGE: | HON. MICHELLE DEAN EASTERLING |
| COURT FROM WHICH APPEALED: | LOWNDES COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: HUNTER NOLAN AIKENS |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: JULIANNE KAY BAILEY |
| DISTRICT ATTORNEY: | SCOTT WINSTON COLOM |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 10/28/2025 |
| MOTION FOR REHEARING FILED: | |

**BEFORE BARNES, C.J., EMFINGER AND WEDDLE, JJ.**

**WEDDLE, J., FOR THE COURT:**

¶1. A Lowndes County Circuit Court jury found Rebecca Bumgardner guilty of three counts of selling less than two grams of methamphetamine. The Lowndes County Circuit Court sentenced Bumgardner as a habitual offender to serve three consecutive eight-year terms in the custody of the Mississippi Department of Corrections (MDOC) without eligibility for probation or parole. On appeal from her convictions and sentences, Bumgardner asserts that (1) the State presented insufficient evidence to support her convictions, (2) the circuit court erred by refusing to instruct the jury on the affirmative

defense of entrapment, and (3) the circuit court erred by failing to issue several requested subpoenas duces tecum. Finding no reversible error, we affirm Bumgardner's convictions and sentences.

## FACTS

¶2. Jeff Edmondson with the narcotics unit of the Lowndes County Sheriff's Office testified that several months prior to Bumgardner's arrest, his unit received complaints and tips about suspected drug activity in the area of Bumgardner's residence. Based on these complaints and tips, the narcotics unit opened an investigation. The narcotics agents began canvassing the neighborhood and trying to corroborate the information about suspected drug activity in the vicinity of Bumgardner's trailer.

¶3. The narcotics agents discovered that a confidential informant named Tonya Blanton was familiar with Bumgardner and willing to attempt to purchase drugs directly from Bumgardner. Edmondson testified that Blanton informed him about a phone call in which Bumgardner had offered to sell Blanton illegal narcotics. Based on the information they had received, Edmondson and other narcotics agents met with Blanton and arranged for her to approach Bumgardner about purchasing drugs.

¶4. On June 28, 2022, Blanton conducted the first of three controlled narcotics purchases involving Bumgardner. Blanton met Edmondson and other agents at a location near Bumgardner's trailer. The agents searched Blanton and her vehicle to ensure Blanton had nothing illegal in her possession that might jeopardize the purchase attempt. The agents also reviewed with Blanton the safety procedures for conducting the narcotics purchase. The

2

agents then gave Blanton $40 to purchase narcotics as well as a recording device to document the purchase. Both Edmondson and Blanton testified that Blanton proceeded to Bumgardner's trailer, where Blanton gave the $40 to Bumgardner. Blanton stated that after Bumgardner counted the money to make sure the amount was correct, Bumgardner asked her boyfriend, Chris Stokes, to give Blanton a substance that the Mississippi Crime Laboratory later identified as methamphetamine. Blanton pretended to eat the methamphetamine but actually hid it inside her pocket.[1] After completing the purchase, Blanton again met with the narcotics agents and turned over the methamphetamine and the recording device. The agents once more searched Blanton and her vehicle to ensure that she had no contraband in her possession that could jeopardize the credibility of the purchase.

¶5.    Edmondson stated that Blanton contacted him again after Bumgardner had confirmed that she (Bumgardner) had more methamphetamine to sell. Based on Blanton's disclosure, the narcotics agents arranged for Blanton to conduct a second controlled purchase from Bumgardner on June 29, 2022. Edmondson testified that the second controlled purchase of methamphetamine was important to "show[] consistency that [Bumgardner was] actively selling" narcotics. Blanton again met agents at a pre-purchase location, where the agents searched Blanton and provided her with money and a recording device. Blanton testified that she called Bumgardner through Facebook Messenger to arrange the second narcotics purchase. After speaking with Bumgardner, Blanton drove to Bumgardner's trailer. When

_____

[1] Both Edmondson and Blanton testified that after completing the narcotics purchase on June 28, 2022, Blanton took a drug test, which confirmed that Blanton had not actually consumed the methamphetamine she purchased.

Blanton arrived, however, Bumgardner was not present. Blanton again spoke with Bumgardner by phone and explained that she had money to give Bumgardner in exchange for drugs. Bumgardner's boyfriend, Stokes, arrived and took Blanton to meet Bumgardner at a different location. Bumgardner then directed Blanton to return to Bumgardner's trailer. When Blanton arrived back at the trailer, she stated that she met Bumgardner's neighbor, Deonna Gattis.

¶6. Blanton followed Gattis inside Gattis's trailer, which was located next to Bumgardner's trailer. Blanton stated that Gattis spoke to Bumgardner over the phone, and then Gattis took Blanton's money in exchange for drugs. After completing the narcotics purchase, Blanton exited Gattis's trailer, where she encountered both Bumgardner and Stokes. Blanton testified that she then drove to the post-purchase location to meet with the narcotics agents. Blanton gave the agents the substance she had purchased, which was later tested and confirmed to be methamphetamine.

¶7. The following day, on June 30, 2022, the narcotics agents arranged a third controlled purchase involving Blanton and Bumgardner. After the agents conducted a pre-purchase search of Blanton and her vehicle, Blanton returned to the property where Bumgardner's and Gattis's trailers were located. Blanton exited her vehicle and handed Bumgardner some money. When Bumgardner asked what kind of drugs Blanton wanted to purchase, Blanton asked for "dope." Bumgardner responded, "Okay," and then she walked inside Gattis's trailer. Blanton stated that both Bumgardner and Gattis exited the trailer, and Gattis handed Blanton a substance later identified as methamphetamine. After Blanton left, she returned

4

to the narcotics agents and turned over the methamphetamine she had purchased.

¶8. Law enforcement officers arrested several individuals, including Bumgardner, Gattis, and Stokes. A Lowndes County grand jury indicted Bumgardner for three counts of selling less than two grams of methamphetamine. At Bumgardner's trial, Gattis testified that she still had charges pending against her for her role in the methamphetamine sales and that the district attorney's office had not offered her a deal or any leniency in exchange for her testimony. Gattis explained that she and Bumgardner were neighbors and had become friends during the three years they had known each other. Gattis admitted that she and Bumgardner not only had used methamphetamine together but also had sold methamphetamine together. Gattis stated that she also had seen Bumgardner sell drugs other than methamphetamine.

¶9. Gattis testified that on June 29, 2022, the date of the second controlled narcotics purchase, Bumgardner asked her to be a lookout because someone was going to stop by Bumgardner's trailer. Gattis stated that she had not met Blanton before that day and did not know Blanton was a confidential informant. Gattis confirmed Blanton's earlier testimony that Bumgardner had called Gattis while Blanton was inside Gattis's trailer. Gattis testified that Bumgardner asked Gattis to sell drugs to Blanton because Bumgardner "felt a little spooked" by Blanton. Gattis agreed to act on Bumgardner's behalf and take Blanton's money in exchange for Bumgardner's methamphetamine. Gattis stated that she gave the money from the drug sale to Bumgardner when Bumgardner arrived at Gattis's trailer.

¶10. Gattis confirmed that she again participated in selling drugs to Blanton the following

day on June 30, 2022. Gattis testified that after Bumgardner took Blanton's money on June 30, 2022, Bumgardner walked inside Gattis's trailer. Gattis stated that once Bumgardner entered the trailer, Bumgardner produced some methamphetamine hidden inside her clothing. Bumgardner asked if Gattis would walk outside and hand the methamphetamine to Blanton, and Gattis agreed. Gattis testified that she handed the methamphetamine to Blanton as Bumgardner stood nearby and watched.

¶11. After the State rested its case-in-chief, Bumgardner testified in her own defense and denied the charges against her. Bumgardner stated that around the time in question, she needed to move items from a storage unit, but she did not have a truck. Blanton had access to a truck and offered to help Bumgardner move her items. Bumgardner testified that every time she encountered Blanton, Blanton would pester her about buying drugs. Although Bumgardner admitted to frequently using drugs, she repeatedly denied that she ever sold them. Bumgardner stated, however, that she lied to Blanton about having drugs to sell because she wanted to use Blanton's truck.

¶12. Bumgardner testified that during her interaction with Blanton on June 28, 2022, her boyfriend, Stokes, placed a small "rock" of methamphetamine on a mirror and passed the mirror to Blanton. According to Bumgardner, neither she nor Stokes had sold the methamphetamine to Blanton. Instead, Bumgardner testified that she and Stokes only intended to allow Blanton to snort methamphetamine with them.

¶13. With regard to the latter two drug purchases that involved Gattis, Bumgardner denied that she ever called Gattis to set up any drug deals. Throughout her testimony, Bumgardner

6

denied that she was ever "involved in a drug deal" or that she received money "at any time to do any kind of drug deals." Bumgardner maintained that she "was just an innocent bystander" and that other individuals had lied and "chose[n] to make it look like [she] was involved" in selling drugs.

¶14. After deliberating, the jury convicted Bumgardner of all three indicted counts. The circuit court sentenced Bumgardner as a habitual offender and ordered her to serve three consecutive eight-year sentences in MDOC's custody without eligibility for probation or parole. The circuit court denied Bumgardner's motion for judgment notwithstanding the verdict or, alternatively, a new trial. Aggrieved, Bumgardner appeals.

## DISCUSSION

### I.     Sufficiency of the Evidence

¶15. Bumgardner contends that the State presented insufficient evidence to support her convictions. We apply the following standard of review to Bumgardner's argument:

> When reviewing a case for sufficiency of the evidence, the relevant question is whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. We review the evidence in the light most favorable to the State. All credible evidence consistent with the defendant's guilt must be accepted as true, and the State is given the benefit of all favorable inferences that may be reasonably drawn from the evidence. We will reverse and render the conviction only if all the evidence and inferences, viewed in the light most favorable to the State, point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty.

*Melton v. State*, 415 So. 3d 645, 653 (¶20) (Miss. Ct. App. 2025) (citations and internal quotation marks omitted).

7

¶16. Here, the circuit court instructed the jurors of the State's burden to prove beyond a reasonable doubt that Bumgardner "did knowingly or intentionally and without authority of law sell or transfer . . . [m]ethamphetamine, in an amount less than 2 grams . . . [t]o another person . . . ." As Bumgardner asserts in her challenge to the sufficiency of the State's evidence, however, she never directly handed the methamphetamine to Blanton on the dates of the three controlled narcotics purchases. Rather, as Bumgardner correctly notes, Stokes handed the methamphetamine to Blanton on the date of the first controlled purchase, and then Gattis handed the methamphetamine to Blanton on the dates of the second and third purchases. The State therefore proposed, and the circuit court gave, accomplice-liability instructions on "aiding and abetting" and "accessory before the fact."

¶17. As the Mississippi Supreme Court has explained,

> [u]nder Mississippi law, one who aids and abets another in the commission of a crime is guilty as a principal. An accessory before the fact is one who does something that will incite, encourage, or assist the actual perpetrator in the commission of the crime. Every person who shall be an accessory to any felony, before the fact, shall be deemed and considered a principal, and shall be indicted and punished as such; and this whether the principal have been previously convicted or not. . . . Aiding and abetting traditionally requires the defendant's presence during the commission of the offense, though that presence may be constructive. But accessory before the fact does not require the defendant's presence during the commission of the offense.

*Williams v. State*, 334 So. 3d 68, 73 (¶8) (Miss. 2022) (citations and internal quotation marks omitted).

¶18. Despite Bumgardner's statements to the contrary, we find the record reflects sufficient evidence for a reasonable jury to conclude that the State proved beyond a reasonable doubt the essential elements of the charges against Bumgardner. The jurors heard Edmondson's

8

testimony as to how the narcotics agents received information about illegal activity in the vicinity of Bumgardner's trailer. Both Edmondson and Blanton testified that prior to setting up the controlled drug purchases, Bumgardner had offered to sell drugs to Blanton. The jury also heard testimony from Edmondson, Blanton, and Gattis about the three drug purchases and watched recorded footage of the purchases.

¶19. Blanton testified that during the first controlled purchase, she handed $40 directly to Bumgardner as payment for the methamphetamine. Blanton stated that Bumgardner then counted and confirmed the amount of the cash before directing Stokes to give the methamphetamine to Blanton. The following day, after Bumgardner confirmed that she had additional methamphetamine to sell, she and Blanton arranged for another narcotics sale. Blanton testified that during this second controlled purchase, Bumgardner called Gattis and asked Gattis to complete the sale on Bumgardner's behalf.

¶20. With regard to the final narcotics purchase, Blanton testified that Bumgardner again took her money but then stood nearby as Gattis actually handed the methamphetamine to Blanton. During Gattis's subsequent testimony, she corroborated Blanton's account of the second and third controlled narcotics purchases. Gattis confirmed that she only participated in the second and third narcotics purchases at Bumgardner's request. On appeal, Bumgardner argues that no reasonable juror could believe the testimonies of Blanton and Gattis regarding their version of events and the extent of Bumgardner's involvement in the three controlled methamphetamine purchases. Our caselaw clearly provides, however, that "it is the duty of the jury to listen to all of the testimony and determine who is a credible

9

witness and whether the evidence supports the crime charged." *Jennings v. State*, 311 So. 3d 712, 723 (¶36) (Miss. Ct. App. 2021) (quoting *Wolverton v. State*, 859 So. 2d 1073, 1076 (¶10) (Miss. Ct. App. 2003)).

¶21. Relevant to the circumstances surrounding Bumgardner's charges, this Court has previously recognized that

> to prove [the] sale of a controlled substance, the State need not prove that the defendant personally placed the substance in the hands of the buyer or that the defendant personally profited from [the substance's] sale. As long as the jury is given a proper instruction on aiding and abetting, the State need only prove substantial knowing participation in the consummation of a sale or in arranging for the sale. Furthermore, any person who is present at the commission of a criminal offense and aids, counsels, or encourages another in the commission of that offense is an aider and abettor and is equally guilty with the principal offender.

*Russell v. State*, 296 So. 3d 217, 224 n.7 (Miss. Ct. App. 2020) (citations and internal quotation marks omitted). Viewing the evidence presented at Bumgardner's trial in the light most favorable to the State, and considering the circuit court's instructions on accomplice liability, we conclude there was sufficient evidence for the jury to find beyond a reasonable doubt that on the three specific dates identified, Bumgardner sold less than two grams of methamphetamine to Blanton. We therefore decline to reverse Bumgardner's convictions and sentences on the basis of insufficient evidence.

## II. Entrapment Jury Instruction

¶22. Bumgardner also contends that the circuit court erred by refusing to give her proposed jury instruction on the affirmative defense of entrapment. We review the circuit court's denial of Bumgardner's proposed jury instruction for abuse of discretion. *Jones v. State*, 382

10

So. 3d 558, 563 (¶22) (Miss. Ct. App. 2024).

¶23.    "Although 'a defendant is entitled to have jury instructions given which present [her] theory of the case[,] this entitlement is limited in that the court may refuse an instruction which [1] incorrectly states the law, [2] is covered fairly elsewhere in the instructions, or [3] is without foundation in the evidence.'" *Id.* (emphasis omitted) (quoting *Clayton v. State*, 106 So. 3d 802, 804 (¶6) (Miss. 2012)).   "Entrapment has been defined as 'the act of inducing or leading a person to commit a crime not originally contemplated by him, for the purpose of trapping him for the offense.'" *Carpenter v. State*, 400 So. 3d 493, 500 (¶23) (Miss. Ct. App. 2024) (quoting *Hopson v. State*, 625 So. 2d 395, 399 (Miss. 1993)).   "To claim entrapment, the person must admit by the person's testimony or other evidence the substantial elements of the offense charged." Miss. Code Ann. § 99-1-25(1) (Rev. 2020). Moreover, anyone raising entrapment as a defense must prove "by clear and convincing evidence" the following:

(a)    The idea of committing the offense was initiated by law enforcement officers or their agents rather than by the person.

(b)    The law enforcement officers or their agents urged and induced the person to commit the offense.

(c)    The person was not predisposed to commit the type of offense charged before the law enforcement officers or their agents urged and induced the person to commit the offense.

Miss. Code Ann. § 99-1-25(2).

¶24.    Here, Bumgardner denied that she had ever sold any illegal substance, and she specifically and repeatedly denied selling methamphetamine to Blanton as charged in the

11

indictment. "[T]o assert an entrapment defense at trial, the statute first requires that a defendant 'admit by the person's testimony or other evidence the substantial elements of the offense charged.'" *Jones*, 382 So. 3d at 566 (¶40) (quoting Miss. Code Ann. § 99-1-25(1)). Because Bumgardner did not admit any wrongdoing, much less "the substantial elements of the offense charged" against her, the defense of entrapment was unavailable to her. Miss. Code Ann. § 99-1-25(1). We therefore agree with the circuit court's finding that Bumgardner was not entitled to have the jury instructed on entrapment. Accordingly, we find no abuse of discretion in the circuit court's refusal of Bumgardner's proposed jury instruction.

### III. Subpoenas Duces Tecum

¶25. In her final issue on appeal, Bumgardner argues that her "rights to present a complete defense, to confront the witnesses against her[,] and to compulsory process were violated by the arbitrary refusal to issue her requested subpoenas duces tecum for text [message] records between Edmondson and Blanton." Bumgardner asserts that the requested subpoenas complied with Mississippi Rule of Criminal Procedure 33(b), which states that "[a] subpoena may, **without a motion or hearing**, require the production of books, papers, documents[,] or other objects at the date, time[,] and place at which the trial, hearing[,] or proceeding at which these items are to be offered in evidence is scheduled to take place." (Emphasis added).

¶26. Prior to trial, Bumgardner's attorneys asked the Lowndes County Circuit Court Clerk to issue subpoenas to Blanton, Edmondson, and Edmondson's cellular service provider. In

compliance with Mississippi Rule of Criminal Procedure 33(b), each subpoena requested that the identified "items, documents, or materials" be produced at Bumgardner's trial before the circuit court. After the circuit court clerk refused to issue the subpoenas, Bumgardner's attorneys raised the matter at a pretrial hearing before the circuit judge. Bumgardner's attorneys asserted that the narcotics agents, especially Edmondson, had "targeted and entrapped" Bumgardner because she previously had contentious interactions with the agents and had posted about the interactions on social media. Bumgardner's attorneys explained that the defense sought access to text messages exchanged by Edmondson and Blanton in the months leading to Bumgardner's arrest to locate evidence to support the defense's theory that Edmondson had sought to target and entrap Bumgardner.

¶27. After hearing the parties' arguments, the circuit judge directed Bumgardner's attorneys to "file a formal motion in the court file." The circuit judge stated that the motion should include the basis for the defense's request, any "specific exhibit [the defense could] point to where [the defense] contend[ed] that the State in [its] discovery ha[d] made reference to those things" that formed the basis of the request, and any relevant caselaw the defense wished the circuit court to consider in the matter. Despite the circuit judge's instructions, the defense never filed a written motion about the subpoenas.

¶28. At several points during Bumgardner's trial, the defense again raised the matter of the requested subpoenas. The circuit judge reiterated the response she had given the defense prior to trial and noted that the defense had failed to file any written motion as instructed. As a result, the circuit judge concluded there was "nothing [for her] to rule on . . . ."

13

¶29. We agree with Bumgardner's arguments on appeal that the circuit court erred by requiring her to file a written motion before she could obtain the "subpoenas duces tecum for production at trial" that she requested. The subpoenas that Bumgardner provided to the circuit court clerk complied with Mississippi Rule of Criminal Procedure 33(b)'s requirements regarding "the production of books, papers, documents[,] or other objects at the date, time[,] and place at which the trial . . . at which these items are to be offered in evidence is scheduled to take place." As a result, Bumgardner was entitled to seek the issuance of the requested subpoenas from the circuit court clerk "without a motion or hearing . . . ." MRCrP 33(b).[2]

¶30. We conclude, however, that the circuit court's error in requiring Bumgardner to file a motion prior to seeking the issuance of the subpoenas was ultimately harmless. As we have previously explained,

> Harmless-error analysis prevents setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial. We do not reverse a conviction for an erroneous evidentiary ruling unless the error adversely affects a substantial right of a party, or in other words, unless the ruling prejudiced the accused. Thus, where it is clear beyond a reasonable doubt that the error did not contribute to the verdict, we need not reverse the conviction.

*Wallace v. State*, 411 So. 3d 1143, 1154-55 (¶29) (Miss. Ct. App. 2025) (citations and internal quotation marks omitted).

¶31. Here, Bumgardner's attorneys informed the circuit court that they sought to obtain the

---

[2] If Bumgardner had instead sought to have the specified items and materials produced at a time other than her trial, then Mississippi Rule of Criminal Procedure 33 would have required her to first obtain a court "order pursuant to this Rule authorizing the issuance of such subpoena[s]." MRCrP 33(c)(1).

text messages exchanged between Edmondson and Blanton to support the defense's theory that Edmondson and other narcotics agents "targeted and entrapped" Bumgardner. As the State asserts, Edmondson and Blanton testified at trial and were subject to cross-examination by the defense about any communication they exchanged prior to Bumgardner's arrest. Indeed, the record reflects that Bumgardner's attorneys conducted rigorous and thorough cross-examinations of the State's witnesses, including both Edmondson and Blanton.

¶32. More importantly, though, as addressed above, Bumgardner repeatedly denied selling methamphetamine to Blanton. Even if Bumgardner had obtained copies of the text messages exchanged between Edmondson and Blanton, her adamant denials of any wrongdoing, much less of "the substantial elements of the offense charged" in her indictment, foreclosed her ability to successfully assert the affirmative defense of entrapment. *See* Miss. Code Ann. § 99-1-25(1). We therefore conclude that the circuit court's error in requiring Bumgardner to file a written motion for the requested subpoenas duces tecum for production at trial was ultimately harmless and fails to require the reversal of her convictions and sentences.

## CONCLUSION

¶33. Because we find no reversible error, we affirm Bumgardner's convictions and sentences for the three counts of selling less than two grams of methamphetamine.

¶34. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., WESTBROOKS, McDONALD, LAWRENCE, McCARTY, EMFINGER AND LASSITTER ST. PÉ, JJ., CONCUR.**

15