# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-KA-00714-SCT

*PEDRO LIMA a/k/a JESUS LIMA*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 02/06/2008 |
| TRIAL JUDGE: | HON. JAMES McCLURE, III |
| COURT FROM WHICH APPEALED: | TATE COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | DAVID L. WALKER |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOHN R. HENRY |
| DISTRICT ATTORNEY: | JOHN W. CHAMPION |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 04/23/2009 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE CARLSON, P.J., DICKINSON AND PIERCE, JJ.**

**DICKINSON, JUSTICE, FOR THE COURT:**

¶1.     In this capital-murder case, the defendant was convicted and sentenced to life in prison without the possibility of parole. He appeals to this Court, asserting that the trial court erred by allowing a witness to testify as an expert, and by denying his motion for a new trial, or in the alternative, for judgment notwithstanding the verdict. Finding no error, we affirm.

### FACTS AND PROCEDURAL HISTORY

¶2.     Daniel Houck hired Pedro Lima to work in his restaurant. In lieu of monetary compensation, Houck provided Lima with a house and living necessities. Trial testimony revealed that Lima was dissatisfied with this arrangement.

¶3.     Ashley Bridges, Lima's girlfriend, testified that Lima did not go to work as scheduled on March 25, 2006. Bridges, who occupied the house with Lima, stated that Lima was angry about not being paid, and that he asked her to call Houck twice that afternoon. Bridges testified that she called Houck and asked him to purchase toilet paper and bring it by the house.

¶4.     Marcelo Mendez, a co-worker at the restaurant, corroborated Bridges's testimony. He testified that Lima was scheduled to work on March 25, 2006, but did not report for duty. Mendez also testified that, before leaving the restaurant that evening, Houck received a phone call requesting he bring toilet paper to Lima's house. Before taking Mendez home from work, Houck went to the store to purchase toilet paper. Houck told Mendez that he was going to Lima's house, and that he was going to ask Lima to leave the house because he was not working.

¶5.     Bridges testified that she did not hear Houck enter the house, but she heard screams from both Lima and Houck. After hearing the screams, Bridges walked into the living room and saw Lima, covered in blood, holding a knife. Bridges testified that she ran back into a back bedroom, but that Lima pulled her out of the bedroom by her hair. When she saw Houck, he was bloody and struggling to breathe. Bridges testified that Lima repeatedly threw an iron at Houck and that, shortly thereafter, Lima went through Houck's pockets and took credit cards, papers, and car keys.

¶6.     Bridges testified that Lima loaded their belongings into Houck's car and that she, Lima, and their daughter fled to Tijuana, Mexico. On the way, she saw Lima throw a knife out of the car. Bridges also testified that, while Lima had been complaining about having no

2

money, she noticed he had a lot of money on the way to Mexico. While in Tijuana, Bridges heard Lima "bragging" about what he had done.[1]

¶7. The day after the murder, Daniel Houck's daughter, Jessica Houck, testified that she had entered the house and found her father's deceased body, although she did not realize it was her father at the time because there was so much blood. Jessica testified that when she and her mother had arrived at the house, her father's car was not parked outside. She also testified that her father typically had cash, credit cards, photographs, and identification in a money clip that he usually kept in his shirt pocket.

¶8. Arthur Steven Chancellor, a senior crime-scene analyst, performed the crime-scene investigation. He found an unopened package of toilet paper on the counter in the kitchen, as well as an old-fashioned iron that was positioned adjacent to Houck's head. He also found a cigarette lighter, some pieces of paper, and a couple of receipts that he concluded were removed from the victim's pocket.

¶9. A post-mortem examination by Dr. Steven Hayne revealed that Houck's death was the result of a homicide, and that the body had numerous lacerations and abrasions, including thirteen slash wounds and five stab wounds. Dr. Hayne testified that two large slash wounds that began on the left side of Houck's neck and ran horizontally across his neck ultimately caused his death.

¶10. With the assistance of Bridges, Lima was apprehended in Memphis, Tennessee. Lima was transported to the Tate County Sheriff's Department and was interviewed by Sheriff

---

[1]The record does not reveal exactly what Bridges heard Lima say. She stated, "He started bragging to them about what he had done and how he had done it."

3

Brad Lance. Lance testified that Lima originally had implicated Mendez for the murder, but that the statement was proven to be false. Once Lima became aware that Mendez could not be held accountable for the murder and that Bridges had made a statement to the police, he admitted killing Houck. He also admitted that Bridges's statement accurately described the events of the murder. Lima subsequently was indicted for capital murder (murder while engaged in the commission of robbery) by a Tate County grand jury.

¶11. At trial, Lima testified in his own defense, claiming that Houck's murder was the result of an argument over working late hours. According to Lima, Houck became angry, grabbed him by the hair and attempted to stab him with a knife. Lima then threw the iron and stabbed Houck in self-defense. Lima testified that he cut Houck's throat to keep him from getting up and killing him.

¶12. The jury found Lima guilty of capital murder, and he was sentenced to life in prison without the possibility of parole. Lima filed a motion for new trial, or in the alternative, for judgment notwithstanding the verdict. The trial court denied the motion, and Lima appealed to this Court.

## DISCUSSION

¶13. Lima raises two issues on appeal:

I.    Whether the trial court erred in finding Dr. Steven Hayne to be an expert witness pursuant to Mississippi Rule of Evidence 702.

II.   Whether the trial court erred in denying his motion for a new trial, or in the alternative, judgment notwithstanding the verdict.

4

### *Testimony of Dr. Steven Hayne*

¶14.    Lima claims that the trial court erred when it allowed Dr. Hayne to testify as an expert. "It is well-settled that the admission of expert testimony is within the sound discretion of the trial judge.  Furthermore, this Court will not reverse a trial court's decision to admit expert testimony 'unless we conclude that the discretion was arbitrary and clearly erroneous, amounting to an abuse of discretion.'" ***Bishop v. State***, 982 So. 2d 371, 380 (Miss. 2008) (citations omitted).

¶15.    Lima asserts that the trial court erred in accepting Dr. Hayne as an expert, because his work load was too heavy, he lacked reliability, his work lacked peer review, and he was not board-certified by the American Board of Pathology in forensic pathology.[2]

¶16.    Mississippi Rule of Evidence 702 is the standard for the admission of expert testimony in Mississippi, and it states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Miss. R. Evid. 702.

¶17.    It is clear from the record that the trial court did not abuse its discretion when it accepted Dr. Hayne as an expert.  Dr. Hayne's testimony as to his medical training and experience within the field, which included more than twenty years of experience within the

---

[2]Lima also alleges that Dr. Hayne was removed from the list of state-designated pathologists in August of 2008.  This allegation is not supported in the record, and thus will not be considered by the Court. *See, e.g., **Boone v. State***, 973 So. 2d 237, 241 (Miss. 2008).

State of Mississippi, exhibited sufficient "knowledge, skill, experience, training, or education" for the trial judge to qualify him as an expert.

¶18. We find nothing in the record to suggest that Dr. Hayne's testimony was not based on "sufficient facts or data." Dr. Hayne's post-mortem examination revealed that Houck's body contained numerous lacerations and abrasions, and that the fatal injury occurred when two slash wounds became confluent and ran horizontally across Houck's neck. Dr. Hayne testified to that effect at trial, and the photographs entered into evidence supported his conclusions.

¶19. Additionally, nothing in the record suggests that Dr. Hayne's testimony was the product of "unreliable principles and methods." Lima claims that Dr. Hayne's testimony was unreliable because he performs many more autopsies annually than the number recommended by the authors of *Forensic Pathology*. However, Dr. Hayne explained that he does not take vacations and works nearly every day of the year, for approximately sixteen hours a day. He explained that performing a large number of autopsies is viewed by some as necessary in order to remain competent in the field. Dr. Hayne also testified that there was no deterioration of his intellectual or physical performance. The State points out that, while Dr. Hayne's work in this particular case was not peer-reviewed, his work in other cases has been. Finally, nothing in the record suggests that Dr. Hayne did not "apply the principles and methods reliably to the facts of the case," nor does Lima point to any specific application errors.

¶20. Thus, based on the foregoing analysis, we hold that the trial court did not abuse its discretion when it accepted Dr. Hayne as an expert.

6

### Motion for a New Trial

¶21.    Lima argues that the trial court erred when it denied his motion for a new trial, or in the alternative, for judgment notwithstanding the verdict. "A motion for new trial challenges the weight of the evidence. In reviewing a challenge to the weight of the evidence, this Court will overturn a jury verdict [only] 'when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.'" *Hearn v. State*, 2008 Miss. LEXIS 607, at \*49 (Dec. 11, 2008) (citations omitted).

¶22.    The verdict in this case cannot be said to have been " so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Id.* Ample testimony was presented at trial to support the jury's finding that Lima murdered Houck during the commission of a robbery. The State produced testimony from nine witnesses, each stating that Lima was angry over the lack of monetary compensation from Houck. Ashley Bridges testified in detail to the events surrounding the murder. The State produced expert testimony and photographic evidence corroborating the State's version of the facts. Finally, Lima confessed to the crime and admitted that Bridges had accurately described the events surrounding the murder.

¶23.    Thus, based on the foregoing analysis, we hold that the jury's verdict was not so contrary to the overwhelming weight of the evidence that allowing it to stand would constitute an unconscionable injustice.

### Motion for Judgment Notwithstanding the Verdict

¶24.    "A motion for a directed verdict or JNOV challenges the sufficiency of the evidence." *Hearn,* 2008 Miss. LEXIS 607, at \*47. "In reviewing a challenge to the sufficiency of the

7

evidence, this Court will reverse and render if the facts and inferences 'point in favor of the defendant on any element of the offense with sufficient force that reasonable men [or women] could not have found beyond a reasonable doubt that the defendant was guilty.'" *Id.* (citations omitted). "The relevant question is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* at *48 (citations omitted). The evidence is considered in the light most favorable to the State." *Id.*

¶25. Lima was convicted of murder while engaged in the commission of the crime of robbery, in direct violation of Mississippi Code Annotated, Section 97-3-19(2)(e) (Rev. 2006), which states:

> (2) The killing of a human being without the authority of law by any means or in any manner shall be capital murder in the following cases:
> . . .
> (e) When done with or without any design to effect death, by any person engaged in the commission of the crime of . . . robbery . . . .

Miss. Code. Ann. § 97-3-19 (Rev. 2006).

¶26. Robbery, in turn, is defined in Mississippi Code Annotated, Section 97-3-79 (Rev. 2006):

> Every person who shall feloniously take or attempt to take from the person or from the presence the personal property of another and against his will by violence to his person or by putting such person in fear of immediate injury to his person by the exhibition of a deadly weapon shall be guilty of robbery . . . .

Miss. Code. Ann. § 97-3-79 (Rev. 2006).

¶27. "The elements of robbery are: '(1) felonious intent, (2) force or putting in fear as a means of effectuating the intent, and (3) by that means taking and carrying away the property from his person or in his presence.'" *Walker v. State*, 913 So. 2d 198, 224 (Miss. 2005)

8

(quoting *Caldwell v. State*, 481 So. 2d 850, 853 (Miss. 1985)). This Court has held that "the intent to rob, which is required to prove the underlying felony of robbery, can be shown from the facts surrounding the crime." *Walker v. State*, 913 So. 2d 198, 224 (Miss. 2005) (quoting *Lynch v. State*, 877 So. 2d 1254, 1266 (Miss. 2004)).

¶28. In determining whether the essential elements of a capital crime are met, Mississippi recognizes the "one continuous transaction rationale." *West v. State*, 553 So. 2d 8, 13 (Miss. 1989). An indictment charging that a killing occurred "while engaged in the commission of" one of the enumerated felonies includes the actions of the defendant "leading up to the felony, the attempted felony, and the flight from the scene of the felony." *Turner v. State*, 732 So. 2d 937, 950 (Miss. 1999) (quoting *West*, 553 So. 2d at 13).

### *Felonious intent*

¶29. It is well recognized that, for a homicide in the commission of one of the enumerated felonies, the only intent required is the specific intent to commit the underlying felony. 3 Jeffrey Jackson & Mary Miller, Encyclopedia of Mississippi Law § 23:49 (2001) (citing *Gray v. State*, 351 So. 2d 1342, 1348 (Miss. 1977)).

¶30. Ample testimony was presented at trial indicating that Lima was angry about his employment arrangement with Houck. Although Houck provided living quarters and other necessities, Lima felt that he should have received monetary compensation also. On the day of the murder, Lima did not go to work because he was angry at Houck for not paying him. Houck received two phone calls requesting that he come to Lima's house. Bridges testified

that she made the two phone calls to Houck, asking him to bring toilet paper to Lima's house, at Lima's request.[3]

¶31. We find that this testimony, coupled with the testimony about the vicious attack on Houck after he was incapacitated, provided sufficient evidence for the jury to find that Lima manifested a felonious intent.

### *Force or putting in fear as a means of effectuating the intent*

¶32. Bridges testified that, after Houck arrived at the residence she shared with Lima, she heard screams from both men. She walked into the living room and saw Lima, covered in blood, holding a knife. She then saw Lima beat Houck repeatedly with an iron. Lima's attack led to Houck's death. Lima then took Houck's money and other property.

¶33. We find that this testimony, coupled with the testimony about Lima's anger over money, provided the jury with sufficient evidence to reasonably find that Lima used force to effectuate the intent.

### *Taking and carrying away the property from his person or in his presence*

¶34. Bridges testified that, as Houck lay dying, Lima went through his pockets, taking credit cards, papers, and car keys. Houck's daughter, Jessica, testified that her father typically kept his cash, cards, photographs, and identification in a money clip in his shirt pocket. Lima and Bridges used Houck's car to flee to Mexico. Bridges testified that Lima, who had previously complained of having no money, suddenly had a lot of money. We find

---

[3]Bridges testified she thought the phone calls to Houck were odd, because there was already toilet paper in the house.

that this testimony provided the jury with sufficient evidence to reasonably find that Lima took and carried away Houck's property from his person.

¶35. Lima's claim that he killed Houck in self-defense was a question of fact for the jury. *See Mohr v. State*, 584 So. 2d 426, 431 (Miss. 1991) ("The jury is the sole judge of the weight of the evidence and the credibility of the witnesses."). Although no one witnessed the argument between Lima and Houck, Bridges testified that she saw Lima beat Houck and go through his pockets while he was bleeding to death. Furthermore, Bridges testified that Lima had a lot of money while in route to Mexico, and that she heard the appellant "bragging" about the murder after they arrived. We find that this testimony provided the jury with sufficient evidence to reasonably find that Lima killed Houck "without the authority of law."

¶36. Thus, considering the evidence in the light most favorable to the State, we hold that a rational juror could have found beyond a reasonable doubt that the State had met its burden in proving all of the elements of capital murder, with the underlying crime of robbery.

## CONCLUSION

¶37. Based on the foregoing analysis, we hold that the trial court did not abuse its discretion in accepting Dr. Hayne as an expert witness. Nor did the trial court err when it denied Lima's motion for a new trial or, in the alternative, for judgment notwithstanding the verdict. We therefore affirm the decision of the Tate County Circuit Court.

¶38. **CONVICTION OF CAPITAL MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT THE POSSIBILITY OF PAROLE, AFFIRMED.**

**WALLER, C.J., CARLSON AND GRAVES, P.JJ., RANDOLPH, KITCHENS AND PIERCE, JJ., CONCUR. CHANDLER, J., CONCURS IN PART AND IN RESULT. LAMAR, J., NOT PARTICIPATING.**