# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2008-KA-00968-SCT

*MALACHY DEHENRE*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 03/13/2008 |
| TRIAL JUDGE: | HON. BILLY JOE LANDRUM |
| COURT FROM WHICH APPEALED: | JONES COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JOHN A. PIAZZA |
| | DAVID M. RATCLIFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | ANTHONY J. BUCKLEY |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 07/01/2010 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.     A trial court may declare a mistrial for misconduct that substantially and irreparably prejudices a party's case. During voir dire in this case, a prospective juror referred to the defendant, Dr. Malachy DeHenre, as an abortionist. We must decide whether this isolated statement required a mistrial. We find that it did not. Any harm caused by the statement was reparable, and the trial court took immediate action to cure any potential prejudice. All the panel members assured that they could set the comment aside and decide the case based

solely on the evidence. Finding no reversible error with regard to the other issues raised by DeHenre, we affirm his conviction and sentence.

## FACTS & PROCEDURAL HISTORY

¶2. Shortly after midnight on January 23, 1997, 911 operators dispatched Jones County deputies and paramedics to the home of Dr. Nyasha DeHenre (Nyasha). Nyasha's ex-husband, Malachy, was standing outside when law enforcement officials and medical personnel arrived. He directed them into the home, where they found Nyasha lying on the couch with a book lying across her stomach, her feet propped up, and a bullet wound to her head. Nyasha died several days later.

¶3. Malachy DeHenre (DeHenre) was charged with murder. His first trial, in 1998, ended when the jury deadlocked, with eleven members voting for acquittal and one for conviction. In December 2006, a grand jury reindicted DeHenre for murder. A second trial ensued in January 2008.

¶4. DeHenre testified that Nyasha had committed suicide. He said that Nyasha was in the midst of an emotionally difficult time. Earlier the same evening, Nyasha had returned from overseas after attending her father's funeral. DeHenre said that Nyasha had also had a heated phone conversation with her mother shortly before the shooting. According to DeHenre's version of events, he and Nyasha were in the same room; he was seated in a recliner and Nyasha was seated on a love seat. DeHenre said that he kept a loaded weapon in the recess of the love seat. As he stood up to adjust his pajamas, he noticed a flash of something metallic. Reflexively, he reached down to grab her arm. But just as he pulled her arm, the

2

gun fired. After seeing that she had been shot, DeHenre said that he laid Nyasha down on the love seat and propped her legs on the arm of the couch. He did not recall her having a book or magazine. He then called Nyasha's mother before calling 911. DeHenre said that he then went to the bedroom and changed clothes as he waited for the ambulance to arrive. When asked why he had left Nyasha on the couch with a bullet in her head while he changed clothes, DeHenre said, "I was going with her to the hospital. I have to go with her in the ambulance. And I can't go just with my drawers."

¶5. The State's experts, Dr. Steven Hayne and Dr. Michael Baden, classified Nyasha's death a homicide. Both clarified that, by using the term "homicide," they simply meant the killing of one person by another. They concluded that the gun was fired from at least eighteen inches away, with twenty-four inches or greater being the probable distance. Baden further determined that Nyasha was shot while lying on her back with her head against the pillow. DeHenre's expert, Dr. Rodrigo Galvez, disputed Hayne's and Baden's opinions. Galvez said that there was incomplete, insufficient evidence to determine the distance from which the gun had been fired. Galvez also contended that Nyasha had been sitting up, not lying down, at the time of the shooting.

3

¶6.    The jury convicted DeHenre of manslaughter. The trial court sentenced him to serve twenty years in prison, to pay a $10,000 fine, and to obtain a GED.[1] DeHenre now appeals to this Court.

## DISCUSSION

### I.    The trial court did not abuse its discretion in refusing to declare a mistrial.

¶7.    Rule 3.12 of the Uniform Circuit and County Court Rules provides that, on any party's motion, a trial court may declare a mistrial for misconduct "resulting in substantial and irreparable prejudice to the movant's case." URCCC 3.12. The decision to do so rests within the sound discretion of the trial court. *Evans v. State*, 725 So. 2d 613, 649 (Miss. 1998) (citations omitted). We will reverse the trial court's decision only for an abuse of discretion. *Id.*

¶8.    During voir dire, panel members were asked the routine question of whether they could reach a decision based solely on the evidence. One juror responded, "Every man is entitled to a fair trial, but when DeHenre left here he became an abortionist." The defense moved immediately for a mistrial, which the trial court ultimately denied. The trial court promptly removed the juror and then addressed the remaining panel members.

> THE COURT:    . . . Can all of you tell me now that whatever this person who obviously was—I don't know what her purpose was. I have no idea. But that was the most outrageous thing

---

[1] A general educational development degree (GED) is the equivalent of a high school diploma. DeHenre is a physician, and the record provides no insight as to why the trial judge thought DeHenre needed a GED.

4

|              | that I've seen in a long time in a courtroom. Can all of you tell me that you will put that aside?" |
|--------------|---|
| JURORS:      | Yes, sir. |
| THE COURT:   | I don't know whether you people come up here—we have come here today, this is a place where people come for justice. We don't come here to make acquisitions [sic] and make statements. I'm sure that that person, her purpose for doing that was to try to prejudice you in some way. But can all of you tell me at this time that you can put that aside[?]" |
| JURORS:      | Yes, sir. |
| THE COURT:   | Is there anyone here who can't put that aside? |
| [DEHENRE]:   | Your Honor— |

Later, during DeHenre's voir-dire examination, panel members indicated once again that they could put the abortionist comment aside and would not let it affect their decision.

¶9.     We are unable to find another case directly on point.  But this is not our first case involving misconduct by venire members.  In such cases, we generally have affirmed a trial court's refusal to declare a mistrial if prospective jurors gave some indication that an improper statement would not impede their ability to be fair.  *See Grayson v. State*, 806 So. 2d 241, 253 (Miss. 2001); *Evans v. State*, 725 So. 2d 613, 649 (Miss. 1997); *Holland v. State*, 705 So. 2d 307, 339-40 (Miss. 1997); *Hopson v. State*, 625 So. 2d 395, 402-03 (Miss. 1993); *Benson v. State*, 551 So. 2d 188, 191 (Miss. 1989).

¶10.    Abortion is, without question, a highly contentious issue that incites strong passions among many people.  That fact makes the comment here perhaps more troublesome than

5

those found in our prior cases. *Compare Grayson*, 806 So. 2d at 253 (prospective juror stated that defendant was apparently "mentally off"); *Holland*, 705 So. 2d at 339 (on resentencing following reversal of a death sentence, prospective juror said he "was in complete agreement with the first sentencing that [the defendant] got"); *Evans*, 725 So. 2d at 649 (prospective juror stated that she found "it very difficult to be in the same room with [the defendant] . . . ."); *Hopson*, 625 So. 2d at 402 (one prospective juror stated, "You never mentioned how much cocaine. My question is how much cocaine and how many people died from that cocaine—is my question," followed by a second prospective juror who said, "If I served on your jury, because of [defense counsel], I would find that person . . . guilty . . . ."); *Benson*, 551 So. 2d at 191 (prospective juror said that he had read in the newspaper that the defendant was a habitual offender).

¶11.    Despite the incendiary nature of abortion, we cannot say that the isolated comment with respect to DeHenre being an abortionist was so irreparably prejudicial as to warrant a mistrial. *See Easter v. State*, 878 So. 2d 10, 21 (Miss. 2004) (citing *Walker v. State*, 671 So. 2d 581, 621 (Miss. 1995)). Immediately after this comment was made, the trial court removed that juror and twice asked the members of the jury pool whether they could put the comment aside. They responded affirmatively. DeHenre never requested individual voir dire. Later on, none of the jurors responded negatively when DeHenre's counsel asked the venire members three or four times if they could assure him that the abortionist comment would not weigh into their decision.

6

¶12.    We find that the trial court did not abuse its discretion in denying DeHenre's motion for mistrial.  The trial judge was peculiarly situated best to decide whether the abortionist comment necessitated a mistrial.  *Easter*, 878 So. 2d at 21 (quoting *Davis v. State*, 530 So. 2d 694, 697 (Miss. 1988)).

### II.    The unavailability of certain evidence did not deprive DeHenre of a fair trial.

¶13.    In pretrial motions, DeHenre filed a motion to dismiss based on missing evidence that he claimed the State had destroyed.  The trial court denied the motion.  DeHenre now asserts that the unavailability of two important pieces of evidence, Nyasha's hair samples and nightgown, violated his due-process rights.

¶14.    The State has a duty to preserve evidence, "but that duty is limited to that evidence which 'might be expected to play a significant role in the suspect's defense.'" *Cox v. State*, 849 So. 2d 1257, 1266 (Miss. 2003) (quoting *Northup v. State*, 793 So. 2d 618, 623 (Miss. 2001)).  We have prescribed a three-part test for determining whether the unavailability of evidence violates a defendant's due-process rights:

(1)    the evidence in question must possess an exculpatory value that was apparent before the evidence was destroyed;

(2)    the evidence must be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means; and

(3)    the prosecution's destruction of the evidence must have been in bad faith.

7

*Murray v. State*, 849 So. 2d 1281, 1286 (Miss. 2003) (quoting *State v. McGrone*, 798 So. 2d 519, 523 (Miss. 2001)). All three prongs must be satisfied.

¶15. DeHenre's argument fails in two respects. First, there is nothing in the record to suggest that the State destroyed the hair samples or the nightgown in bad faith. Bad faith requires "evidence of fraud, willful or deliberate destruction of evidence[,] or a desire to suppress the truth . . . ." *Murray*, 849 So. 2d at 1286. Nothing suggests that type of behavior here. The State expressed that, to the best of its knowledge, no one had destroyed any evidence. DeHenre offered no evidence to the contrary. Further, nothing shows that the State prevented DeHenre from presenting proof on the issue of bad faith. *Cf. McGrone*, 798 So. 2d at 523 (police officers' refusal to appear at two separate hearings absolutely prevented defendant from presenting proof of bad faith).

¶16. Second, the exculpatory value of the hair samples and the nightgown is highly suspect. As discussed below, it is unlikely that either piece of evidence would have played a significant role in DeHenre's defense.

¶17. DeHenre assumes that the hair samples taken during the autopsy were taken from around the entrance-wound area. The samples taken from this area, he argues, would have shown gunpowder residue and thus confirmed a close-range gunshot. But the location from which the hair was taken is unknown. Dr. Steven Hayne, who performed the autopsy, confirmed that he did pull hair samples as part of his examination. According to Hayne, this is done routinely as a means of preserving DNA material. The samples, he explained, would have been pulled and sent to the crime lab largely as a matter of course. Yet neither Hayne

8

nor his autopsy report could verify from where the hair was pulled. Thus even if the hair samples had been available, it is doubtful that they would have been of much value without knowing from where on the scalp they had been pulled. Furthermore, the fact that the entrance wound was located an inch or so below the hairline makes the surrounding hair less important due to the amount of skin surface around the wound site that did not have hair.[2]

¶18.    The exculpatory value of the nightgown also is doubtful. DeHenre asserts that residue tests on this garment would have proven that the gun was not fired at the distance claimed by Hayne. Steve Byrd, a forensic scientist at the Mississippi Crime Laboratory, testified that he examined the nightgown visually, microscopically, and chemically. On both the right and left cuffs, he found residue "indicative of gunpowder particles." But he also found residue on a lower part of the gown, near the calf area. Byrd testified that, because of this wide spread of residue, he could not make any scientific conclusions about the distance of the gunshot. Byrd explained that he received the gown in poor condition, cut up and wadded in a paper bag. As a result, he could not rule out the possibility that there had been a "transfer of particles." All in all, Bryd stated that he could not make a valid test one way or another based on the condition of the nightgown.

¶19.    Importantly, the jury heard both sides' arguments concerning the ramifications of the missing hair samples and nightgown. Hayne and Baden asserted that the hair samples were nonessential due to amount of nonhairy skin surface around the entrance wound. Galvez

---

[2]  *See infra* Issue IV.

disagreed. The jury was then able to weigh these experts' opinions against the autopsy photos which showed up-close images of an entrance wound located an inch or so below the hairline. Likewise, the jury heard Byrd's testimony that the nightgown had gunpowder residue on it.

¶20. Based on the lack of any proof of bad faith by the State, and considering the poor likelihood of the hair samples or nightgown playing any significant role in his defense, we find that DeHenre's due-process rights were not violated.

### III. The trial court did not abuse its discretion in allowing Dr. Patel to testify.

¶21. "The standard of review regarding admission [or exclusion] of evidence is abuse of discretion. Where error involves the admission or exclusion of evidence, this Court 'will not reverse unless the error adversely affects a substantial right of a party.'" *Ladnier v. State*, 878 So. 2d 926, 933 (Miss. 2004) (citing *Whitten v. Cox*, 799 So. 2d 1, 13 (Miss. 2000) (citations and internal quotation marks omitted) (brackets in original)).

¶22. Dr. B. R. Patel, a colleague and friend of Nyasha, testified about a meeting he had with the two DeHenres in October 1996, just months before the shooting. The meeting, instigated by Patel, took place in Patel's home. Patel testified that, during the meeting, DeHenre "was shouting at [Nyasha and that] [h]e was mad at her. He was talking about the letter he [had] received from her attorney about the divorce, and he did not like that. . . . He was shouting in my house banging on the glass table . . . ." According to Patel, DeHenre said that "Nyasha cannot leave me unless she is in a body bag."

10

¶23. DeHenre denied making the "body bag" statement. DeHenre, who is a physician, said that he had never heard of a body bag until the Iraq War. "That's when [the term body bag] became popular," explained DeHenre.

¶24. DeHenre advances two reasons for excluding Patel's testimony. First, DeHenre asserts that his statements to Patel were protected under the doctor-patient privilege. Second, he argues that the October 1996 meeting was "too remote in time" from the events surrounding Nyasha's death.

### A. The doctor-patient privilege does not apply to this case.

¶25. Rule 503(b) of the Mississippi Rule of Evidence states that "[a] patient has a privilege to refuse to disclose and to prevent any other person from disclosing . . . knowledge derived by the physician or psychotherapist by virtue of his professional relationship with the patient . . . ." Miss. R. Evid. 503(b). There is no dispute that Patel is a physician; therefore, we must decide only whether DeHenre was a patient. The rules define a patient as "a person who consults or is examined or interviewed by a physician or psychotherapist." Miss. R. Evid. 503(a)(1).

¶26. Considering Patel's testimony as a whole, we find that DeHenre was not Patel's patient. Patel's primary purpose for calling the October 1996 meeting was to get Nyasha to return to practicing medicine in Laurel, Mississippi, and to begin sharing medical calls with him again. The DeHenres' relationship was merely a subsidiary concern. Although Patel did state at one point that he did "counsel" in his office, he made clear that he was not attempting to perform a marriage-counseling session at the October 1996 meeting.

11

¶27.    Because DeHenre was not a patient, the doctor-patient privilege is inapplicable.

**B.      The October 1996 meeting was not too remote in time to be relevant.**

¶28.    A period of about three months and twenty-two days elapsed between Patel's meeting with the DeHenres and the shooting.[3]  DeHenre contends that the two events were unconnected, and that the passage of time made Patel's testimony irrelevant and highly prejudicial.  He cites *Stewart v. State*, 226 So. 2d 911 (Miss. 1969), and *West v. State*, 463 So. 2d 1048 (Miss. 1985), as support.

¶29.    In *Stewart*, the defendant was convicted of shooting with intent to kill.  *Stewart*, 226 So. 2d at 911.  This Court reversed the conviction due to an erroneous jury instruction.  Yet the Court went on to address the trial court's exclusion of evidence that showed threats and provocations had been made some six months before the shooting.  *Id.* at 912.  This Court found no abuse of discretion in the exclusion of such evidence.  *Id.*  The Court stated that "[t]he determination of whether evidence is too remote to be relevant is ordinarily left to the discretion of the trial judge, and his decision will not be reversed in the absence of a clear proof of abuse of that discretion."  *Id.* (citing R. Anderson, *Wharton's Criminal Evidence*, § 149 (12th ed. 1955)).

¶30.    In *West*, the defendant was convicted of capital murder and sentenced to death.  *West*, 463 So. 2d at 1050.  This Court reversed because the jury had heard evidence that the

---

[3] October 1, 1996, to January 23, 1997, equals three months and twenty-two days. October 31, 1996, to January 23, 1997, equals two months and twenty-three days.

defendant had participated in two killings in Georgia just thirty-six hours or more prior to the Mississippi crime. *Id.* at 1051. The Court found that "a separation of time and motive" set the Georgia and Mississippi crimes apart. *Id.* at 1052. The two events were not so interrelated as to make the Georgia murders a necessary part of the story as to what happened in Mississippi. *Id.*

¶31. Neither *Stewart* nor *West* persuades us that the October 1996 meeting was too remote in time to be relevant. *Stewart* merely affirms that a trial court has considerable discretion in deciding whether evidence is too remote in time. *Stewart*, 226 So. 2d at 912. Further, the two events in *West*, unlike the case before us, were not so intertwined that both were necessary to communicate a coherent story. *West*, 463 So. 2d at 1052. Here, Patel's testimony about the meeting enabled the State to present a coherent story of the DeHenres' tumultuous relationship and supplied a potential motive for why DeHenre might have killed Nyasha. The State already had begun to develop this story through its first witness, Marcia Easterwood, a coworker of Nyasha, who had testified that she had seen Nyasha walking the hospital with a "body guard or security guard" on two different occasions in August 1996.

¶32. We find that the October 1996 meeting was not too remote in time to be relevant, and that the trial court did not abuse its discretion in allowing Patel to testify about that meeting.

IV.     **The trial court did not abuse its discretion in allowing Dr. Hayne to testify.**

¶33. The admission of expert testimony is within the sound discretion of the trial judge, and we will not reverse the trial judge's decision unless it was "'arbitrary and clearly erroneous,

13

amounting to an abuse of discretion.'" *Lima v. State*, 7 So. 3d 903, 907 (Miss. 2009) (citations omitted).

¶34. DeHenre argues that Hayne was unqualified to testify; that his methods and conclusions were unreliable; and that his autopsy was inadequate.

¶35. This Court recently held that Hayne is qualified to testify as an expert. *Lima*, 7 So. 3d at 907-08. DeHenre makes much of the fact that Hayne is not board-certified by the American Board of Pathology, a certification which the state medical examiner must have under our law. Miss. Code Ann. § 41-61-55 (Rev. 2009). Section 41-61-55 does, in fact, state that "[e]ach applicant for the position of State Medical Examiner shall, as a minimum, be a physician who is eligible for a license to practice medicine in Mississippi and be certified in forensic pathology by the American Board of Pathology." Miss. Code Ann. 41-61-55 (Rev. 2009). The statute is inapposite, however, because Hayne was neither an applicant for state medical examiner nor a holder of that office.

¶36. DeHenre points to three specific defects that he says rendered Hayne's autopsy inadequate and unreliable. He first argues that Hayne failed to consider Nyasha's hair around the entrance wound, and how her hair could have prevented the presence of tattooing (gunpowder marks embedded in the skin surface) or gunshot residue. The absence of tattooing, residue, etc., weighed heavily in Hayne's conclusion that the gun was not fired in direct contact with, or slightly away from, the skin. On cross-examination, Hayne conceded that hair could act as a filter to prevent gunpowder residue from contacting the skin. But Hayne's opinion, with which Baden agreed, was that the entrance wound was about an inch

14

below Nyasha's hairline; and therefore, there was no hair to prevent tattooing, residue, or the like. Hayne and Baden thus believed that there was no need to examine the hair around the entrance wound. DeHenre's expert, Dr. Rodrigo Galvez, thought otherwise. Galvez stated that he could not render an opinion about the distance of the gunshot without having and examining the hair around the entrance wound.

¶37. The dispute concerning the hair around the entrance wound was simply a "battle of the experts." The jury was able to hear arguments on both sides. Additionally, the jury had the benefit of the autopsy photos, which showed up-close images of the entrance wound.

¶38. DeHenre secondly asserts that Hayne testified to performing a microscopic examination of the tissue inside the entrance wound, but that there is no mention of such an examination in his autopsy report. Contrary to DeHenre's assertions, Hayne's autopsy report does indicate a microscopic analysis of this area. Subsection (H) of the section titled "MICROSCOPIC ANALYSES" states that "[a] section of the dura at the site of the entrance gunshot wound fails to reveal evidence of gunpowder."

¶39. Finally, DeHenre points out that Hayne's autopsy report states incorrectly that the exit wound was in the temple rather than behind the left ear. While this was erroneous, Baden explained that Hayne's descriptions and diagrams confirmed that he had meant the left back of the head, not the temple. We do not believe that this minor error made Hayne's testimony unreliable.

¶40. Consistent with our prior holding in *Lima*, we find that Hayne was qualified to testify as an expert. And we find no evidence to establish that his testimony was unreliable. Accordingly, the trial court did not abuse its discretion in allowing Hayne to testify.

**V. The trial court did not abuse its discretion in allowing Dr. Baden to testify.**

¶41. As already stated, the admission or exclusion of expert testimony is reviewed on an abuse-of-discretion standard. *Lima*, 7 So. 3d at 907.

¶42. DeHenre maintains that Baden's testimony was inadmissible because he had relied on Hayne's dubious autopsy report, and because it amounted to needless cumulative evidence under Rule 403 of the Mississippi Rules of Evidence. He further argues that Baden's homicide theory was unreliable because it was not based on sufficient facts or reliable principles and methods.

¶43. Baden is well-qualified to testify as an expert in pathology. He is board-certified in anatomic, clinical, and forensic pathology. His writings have been published in approximately eighty publications, and he estimated that he had testified close to 1,000 times over his forty-five-year career. He served as a consultant for the United States Congress Select Committee on Assassinations, which was established to review the deaths of President John F. Kennedy and Dr. Martin Luther King, Jr. Baden also performed the re-autopsy of Medgar Evers in the early 1990s, and testified in the retrial of Byron De La Beckwith.

¶44. We have concluded already that Hayne's autopsy results were not unreliable. Thus, Baden was permitted to rely on Hayne's report.

16

¶45. Baden did, in fact, testify to many of the same things as Hayne. He called Hayne's autopsy "a very good forensic pathology report. Much better than the autopsy on President [John F.] Kennedy." After reviewing Hayne's report, photographs, the statements of law enforcement and medical personnel at the scene, and the ballistics tests, Baden classified Nyasha's death a homicide.

¶46. Although Baden reinforced Hayne's testimony to an extent, Baden's testimony was not entirely cumulative. Baden introduced new evidence concerning test patterns that were fired from the gun that killed Nyasha. He had requested that the test patterns be conducted, and he testified about the results of those tests.

¶47. DeHenre also points to a specific portion of Baden's testimony that DeHenre says discounts the reliability of Baden's homicide theory. When asked on cross what he made of the gunpowder residue found on Nyasha's nightgown, Baden responded as follows:

> [BADEN]: I couldn't figure that out because I know that there was also a description of a gunshot particle on the right hand that didn't make sense. And I don't know—I can't interpret that because it doesn't indicate how much the spread, what the particulate matter was."
>
> [DEHENRE]: That's right. And when you say you can't make sense of that, you can't make sense of it in view of the [homicide] opinion you've rendered?
>
> [BADEN]: No. I don't know as far as that goes what that means.

DeHenre argues that this shows Baden's inability to reconcile key evidence with his own homicide theory.

17

¶48. We find no merit in this assertion. Before and after this particular portion of Baden's testimony, Baden explained that he did not garner much from the residue on Nyasha's hand or nightgown, because the reports were unclear as to what the residue or matter actually was. In other words, without further details, he could not adequately interpret that data. Baden was not conceding or suggesting that this evidence was irreconcilable with his prior opinion.

¶49. Because we find that Baden's testimony was neither unreliable nor cumulative, the trial court did not abuse its discretion in allowing his testimony.

## VI. The trial court did not abuse its discretion in allowing the testimony of Dora Morgan, the 911 operator.

¶50. The admission of testimony is reviewed on an abuse-of-discretion standard. ***Ladnier***, 878 So. 2d at 933 (citing ***Whitten***, 799 So. 2d at 13).

¶51. Dora Morgan was working as a 911 dispatcher on the evening in question. She testified that she received a call from DeHenre's daughter, also named Nyasha. Morgan stated that Nyasha told her "that my father has shot my mother." She continued:

| [MORGAN]: | And I asked her did she see him do it. And she said no, but I see [sic] him with a pistol. |
|---|---|
| [STATE]: | That she what? |
| [MORGAN]: | That she saw him with a pistol. |
| [STATE]: | and be specific now. If you need to go back to your notes you can. What did she say . . . . |
| [MORGAN]: | She did tell me that she heard her mother and father arguing. And she went into the room where her mother was at. And she told me, she said, my mother has been shot. And let me refer back because I want to give you |

18

the — she stated that she didn't see him do it but that she did see him with a pistol. She went to the room where her mother was at and she saw that she was shot. She thought her mother was dead.

[STATE]: And what did she say about her father?

[MORGAN]: She told me that her father had gone mad. She was scared of him, and she was not going to go back to the house to where they were at.

¶52. DeHenre argues that Morgan's testimony was inadmissible hearsay. He also argues that his daughter's statements were inadmissible as prior inconsistent statements.

### A. Morgan could testify as to the daughter's statements under the excited-utterance exception to the hearsay rule.

¶53. Rule 803(2) of the Mississippi Rules of Evidence provides the "excited-utterance" exception to the hearsay rule. Miss. R. Evid. 803(2). Under the excited-utterance exception, "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is considered admissible hearsay. Miss. R. Evid. 803(2). The theory behind this exception is "that circumstances may create such an excited condition that the capacity for reflection is temporarily impeded and that statements uttered in that condition are thus free of conscious fabrication." Miss. R. Evid. 803(2) cmt. The two most important factors are spontaneity and the duration of the excited state. Miss. R. Evid. 803(2) cmt.

¶54. We find that the daughter's statements were an excited utterance. She called 911 from a neighbor's home just minutes after the shooting. She had just seen that her mother had been shot and believed her to be dead. And she saw her father with a pistol. Given the brief

19

amount of time between the shooting and the 911 call, as well as the shocking scene she had just witnessed, the daughter's statements fit well within the requirements of Rule 803(2). *See Carter v. State*, 722 So. 2d 1258, 1261 (Miss. 1998).

¶55. A portion of the daughter's statement, however, does present a problem. The excited-utterance exception requires the declarant to have personal knowledge of the event that triggered the excitement. *See* Miss. R. Evid. 803(2) cmt. But the daughter here did not witness the actual shooting. Because her statement that "my father has shot my mother" was not based on personal knowledge, it should have been excluded. Its admission, however, was harmless error. Immediately after the jury heard this statement, it heard Morgan testify, "And I asked [the daugther] did she see him do it. And she said no . . . ." Any danger that the jury would be misled by the inadmissible statement was removed by the immediate clarification that Nyasha did not see the actual shooting.

¶56. We find that the daughter's statements during the 911 call fall under the excited-utterance exception to the hearsay rule, and that the admission of the statement "my father has shot my mother" constituted harmless error. Accordingly, the trial court did not abuse its discretion in permitting Morgan to testify about the 911 call.

**B.     The daughter's statements were not prior inconsistent statements.**

¶57. Prior inconsistent, out-of-court statements made by a nonparty witness are not admissible as substantive evidence. *Moffett v. State*, 456 So. 2d 714, 719 (Miss. 1984) (citations omitted).

20

¶58. DeHenre argues that his daughter later recanted the statements she made to Morgan. In a signed affidavit dated August 1, 1997, the daughter recanted her "entire statements made to the D. A.'s office in Laurel MS. [sic] January 28th 1997, regarding the incident of January 23rd. [sic] 1997. [sic] at No. Paul Harvey Rd. [sic] MS. [sic] 39440." The affidavit makes no mention of the 911 call.

¶59. Nothing in the record shows that the daughter ever recanted the statements she had made during the 911 call, or that she has given other testimony inconsistent with those statements. Therefore, the daughter's statements to Morgan were not prior inconsistent statements.

¶60. Because the daughter's statements during the 911 call were not inadmissible as prior inconsistent statements, and because those statements fell within the excited-utterance exception to the hearsay rule, the trial court did not abuse its discretion in allowing Morgan to testify about the 911 call.

## CONCLUSION

¶61. We find no error that warrants reversal of this case. As a result, we affirm the judgment of the trial court.

¶62. **CONVICTION OF MANSLAUGHTER AND SENTENCE OF TWENTY (20) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH CONDITIONS, AND PAYMENT OF A FINE IN THE AMOUNT OF $10,000.00, AFFIRMED.**

CARLSON, P.J., RANDOLPH, LAMAR AND PIERCE, JJ., CONCUR. DICKINSON, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY GRAVES, P.J., KITCHENS AND CHANDLER, JJ.

DICKINSON, JUSTICE, DISSENTING:

21

¶63.    At the conclusion of Dr. Malachy DeHenre's first trial, eleven jurors voted to acquit him.  At the beginning of his second trial, during jury selection, a potential juror – in front of all the other potential jurors – accused the defendant (a medical doctor) of being an abortionist.  According to the trial judge, the abortionist accusation was "the most outrageous thing that I've seen in a long time in a courtroom."  But rather than questioning each potential juror – in private – about such important information as their personal, moral, and religious views of abortion; their opinions of the doctors who perform them; and their families' personal experiences,[4] the trial judge simply asked the entire group if they could "put that aside," to which the jurors replied, en masse, "yes sir."  At the conclusion of the second trial, they unanimously voted to convict.

¶64.    The majority – finding the abortionist comment "perhaps more troublesome than [comments such as the defendant being] mentally off" – concludes the trial judge committed no error or, if he did, it was "harmless."  I disagree and respectfully dissent.

**ANALYSIS**

¶65.    We have never addressed this situation.  However, the Fifth Circuit has,[5] citing with approval the American Bar Association's standards for the conduct of trials -- standards which, though not binding on our courts, set forth sound and sensible principles.  Standard 15-2.4 for the conduct of jury trials reads in part:

---

[4]Does the majority really think, for instance, that a juror whose child obtained an abortion without parental consent would raise his or her hand and discuss the matter in front of everyone?  And does the majority actually believe the potential juror could "put it aside?"

[5] *U.S. v. Davis*, 583 F.2d 190, 196-198 (5th Cir. 1978).

22

(e) Jurors should be examined outside the presence of other jurors on sensitive matters or prior exposure to potentially prejudicial material.

> (1) Sensitive matters are those matters which might be potentially embarrassing or intrusive into the juror's private life, feelings or beliefs, or those matters which if discussed in the presence of the jury panel, might prejudice or influence the panel by exposing other potential jurors to improper information.

> (2) Examination of the prospective juror with respect to that juror's exposure to potentially prejudicial material should be conducted in accordance with ABA Standards for Criminal Justice relating to Fair Trial and Free Press.[6]

The standards referred to in (e)(2) read in part:

> The following standards govern the selection of a jury in those criminal cases in which questions of possible prejudice are raised:

> (a) If there is a substantial possibility that individual jurors will be ineligible to serve because of exposure to potentially prejudicial material, the examination of each juror with respect to exposure should take place outside the presence of other chosen and prospective jurors. An accurate record of this examination should be kept by a court reporter or tape recording whenever possible. The questioning should be conducted for the purpose of determining what the prospective juror has read and heard about the case and how any exposure has affected that person's attitude toward the trial, not to convince the prospective juror that an inability to cast aside any preconceptions would be a dereliction of duty.

> (b) Whenever prospective jurors have been exposed to potentially prejudicial material, the court should consider not only the jurors' subjective self-evaluation of their ability to remain impartial but also the objective nature of the material and the degree of exposure. *The court should exercise extreme caution* in qualifying a prospective juror who has either been exposed to highly prejudicial material or retained a recollection of any prejudicial material.[7]

---

[6] *ABA Standards for Criminal Justice: Trial by Jury*, Standard 15-2.4(e): Conduct of Voir Dire Examination (1993).

[7] *ABA Standards for Criminal Justice: Fair Trial and Free Press*, Standard 8-3.5: Selecting the Jury (3d ed. 1992).

¶66. American opinion concerning abortion is sharply divided along moral, religious, and constitutional lines. Few topics are more sensitive, and labeling the defendant – in front of the entire venire – an abortionist, surely could "intru[de] into the juror's private life, feelings or beliefs." No one -- including my colleagues in the majority -- would dispute the "potentially prejudicial" nature of the remark.

¶67. In *Davis*, the potentially prejudicial remark came not from a venireman but rather from pretrial publicity.[8] But the source of the prejudicial information does not change the analysis. The *Davis* court – holding that questioning the jury panel as a group was inadequate – wrote:

> Under the circumstances of this case, where the nature of the publicity as a whole raised a significant possibility of prejudice, the cursory questioning by the court was not enough. The court should have determined what in particular each juror had heard or read and how it affected his attitude toward the trial, and should have determined for itself whether any juror's impartiality had been destroyed. The ABA Standards Relating to Fair Trial and Free Press recommend that the district court examine each juror individually and out of the presence of other jurors to determine what he heard or read and how it has affected his attitudes towards the trial.[9]

¶68. The view I express today does not require individual voir dire in every case involving a prejudicial remark. Indeed, the *Davis* court declined to declare a bright-line rule, stating instead that "[alt]hough separate examination of jurors is sometimes preferable, it is not

---

[8] *Davis*, 583 F.2d at 196.

[9] *Id.*

24

necessarily required. We recognize the district court's need for flexibility in interrogating jurors as to possible prejudice."[10]

¶69.   While I readily agree with that sensible approach, I am firmly convinced that, in this case, the abortionist accusation "raised a significant possibility of prejudice, [and that] the cursory questioning by the court in this case was not enough: "The [trial] court erred in not undertaking a more thorough examination of those panel members . . . ."[11]

¶70.   The **Davis** opinion stressed, too, that the judge should not simply ask the jurors whether they "can lay aside any impression or opinion due to the exposure" to potentially prejudicial information.[12] The judge must make that determination, because "[t]he juror is poorly placed to make a determination as to his own impartiality."[13]

¶71.   In today's case, after the jurors had heard the abortionist remark and the defense had moved for a mistrial, the following exchange ensued:

| The court: | "Can all of you tell me now that whatever this person who obviously was -- I don't know what her purpose was. I have no idea. But that was the most outrageous thing that I've seen in a long time in a courtroom. Can all of you tell me that you will put that aside?" |
|---|---|
| Jurors: | "Yes, sir." |
| The court: | "I don't know whether you people come up here -- we have come here today, this is a place where people come for justice. |

_____

[10] *Id.* at 196-97.

[11] *Id.*

[12] *Id.* at 197.

[13] *Id.*

25

> We don't come here to make acquisitions [*sic*] and make statements. I'm sure that that person, her purpose for doing that was to try to prejudice you in some way. But can all of you tell me at this time that you can put that aside[?]"

Jurors: "Yes, sir."

¶72. The judge should not have simply accepted a perfunctory "yes, sir" from the group. Individual voir dire would have provided him, and us, with much more reliable answers to important questions that were not even asked.

¶73. Apparently – and surprisingly – no previous case exists in any jurisdiction in which a member of the jury venire labeled the defendant an abortionist in the presence of other jurors.[14] This is not, however, the first time that a potential juror has made a highly prejudicial remark about a defendant during voir dire. The Georgia Court of Appeals has addressed at least two such situations.

¶74. During voir dire in an arson trial, a prospective juror said of the defendant, "He was a volunteer [fireman]. I worked with a guy that said that he [the defendant] was a firebug. He said that he would be the first one on the fire scene; that he would set the fire and then run back to the fire house."[15]

---

[14]This, of course, could be due to the fact that most courts would simply grant a mistrial.

[15] *Moore v. State*, 156 Ga. App. 92, 92-93, 274 S.E.2d 107, 108 (1980).

26

¶75.   The trial court disqualified the venireman and gave curative instructions to those remaining.[16] The defendant moved for a mistrial, or alternatively, for a continuance, and the trial judge denied both motions.[17] The Georgia Court of Appeals reversed, stating:

> It cannot seriously be argued that a prospective juror in an arson case could remain neutral after hearing sworn testimony by another prospective juror to the effect that the defendant was reputed to be a firebug. If such knowledge was sufficient to authorize the disqualification of the panel member who made the statement, as the trial court evidently concluded, it was necessarily sufficient to require the disqualification of the others.[18]

¶76.   The *Moore* court relied on another Georgia case wherein, during voir dire in a rape trial, a prospective juror, in the presence of the venire, "named several persons known to him who claimed that the defendant was a peeping tom."[19] When the defense moved for a mistrial, the trial judge declined to disqualify the jury panel.[20] The Georgia Court of Appeals reversed, holding that

> The statements made by the prospective juror in the presence of the remainder of the panel were prejudicial and entitled the appellant to a new panel. Had the juror said nothing more that [*sic*] he heard too much about the defendant to be impartial, disqualification of the remainder of the panel would not have been necessary. However, the responses subsequently elicited from him went far beyond this and constituted improper testimony which branded the accused as a sex deviate before the trial had even begun. An instruction to the remainder

---

[16] *Id.* at 108.

[17] *Id.*

[18] *Id.*

[19] *Lingerfelt v. State*, 147 Ga. App. 371, 372, 249 S.E.2d 100, 102 (1978).

[20] *See id.* at 103.

of the panel to disregard these comments could not have been sufficient to erase the potential harm done.[21]

¶77.   We of course are not bound by a sister state's caselaw.  But I find these two cases instructive and persuasive.  The abortionist accusation in today's case was at least as prejudicial as those in the Georgia cases.  Indeed, "firebug" and "peeping Tom" strike me as considerably less inflammatory labels than "abortionist" – and particularly if some of the potential jurors harbored moral, religious, and personal views against abortion.

¶78.   In DeHenre's first trial -- in the absence of any allegation that the defendant was an abortionist -- eleven jurors voted for acquittal and only one for conviction.  Although that fact is not dispositive, it suggests that the abortionist accusation may very well have irreversibly inflamed the passions of at least one person on the second jury, resulting in prejudice to DeHenre.[22]

¶79.   Because of the strong possibility that the abortionist comment caused "substantial and irreparable prejudice to [DeHenre's] case"[23] in the mind of at least one juror, I would reverse and remand for a new trial.

        **GRAVES, P.J., KITCHENS AND CHANDLER, JJ**., **JOIN THIS OPINION.**

---

[21] *Id.* at 103 (citations omitted).

[22] *See* URCCC 3.12 (stating that the trial court may declare a mistrial in the event of "substantial and irreparable prejudice to the movant's case").

[23] *Id.*

28