IRVING, J.,
for the Court:
¶ 1. A jury in the Harrison County Circuit Court convicted Larry Tyrese Minter of two counts of capital murder and one count of robbery. The circuit court then sentenced Minter to two life sentences in the custody of the Mississippi Department of Corrections (MDOC), without the possibility of parole or early release, for the capital murders and to fifteen years in the custody of the MDOC for the robbery. The circuit court ordered that the fifteen-year sentence run consecutively to Minter’s life sentences. Unhappy with the circuit court’s judgment, Minter appeals and asserts that he was prejudiced by the admission of hearsay, that his confrontation rights were improperly limited by the circuit court, and that the weight of the evidence is against his conviction.
¶ 2. Finding no reversible error, we affirm the judgment of the circuit court.
FACTS
¶ 3. On the morning of December 15, 2006, Harold Joseph Levron Jr. walked into his home in Gulfport, Mississippi. A home invasion was in progress. According to the evidence at trial, Minter, Lazairian Murphy, Darryl Simmons, and Junior Green had broken into the home to steal the contents of a safe. Levron struggled with the four men in his home and was eventually shot and küled. Minter’s ac *520 complices consistently stated that Minter shot Levron with Levron’s own gun that was taken from him sometime during the struggle.
¶ 4. At some point during the burglary, Levron’s friend, Christiana Ann Súber, entered the home. It is not clear whether Levron was already dead when Súber arrived. When Súber saw the men in Lev-ron’s home, she attempted to flee. She was able to get out of the house, but one of the burglars captured her and took her into the house. Back inside, Súber was sexually assaulted by Green. She was then restrained with duct tape, which was wrapped around her head, arms, and legs. According to Green’s and Simmons’s pretrial statements, which were not admitted at trial, the burglars then discussed whether to leave Súber alive; Minter allegedly stated that she could not be left alive. The other men then went outside the house; shortly thereafter, they heard a single gunshot. Minter came outside and told them that he had killed Súber. Minter and the other burglars then left in Lev-ron’s truck, which they drove to a bridge where Minter threw away Levron’s gun.
¶5. Suber’s son, William, and her ex-husband, John Crittenden, arrived at Lev-ron’s home after Súber had failed to show up for a prearranged outing. Crittenden testified that the first thing he noticed upon approaching the house was a red and gold jacket that was lying outside on the ground; Crittenden recognized the jacket as one that Súber had gotten recently and was very proud of. Crittenden and William knocked on the front door of the home several times; when there was no answer, they opened the door and saw Levron’s body. Crittenden testified that they immediately left and called 911. Officers arrived at the scene and, after obtaining a search warrant, conducted a search.
¶ 6. When officers entered the home, they immediately observed Levron’s body near the front entryway of the home. The officers then searched the rest of the house. In a hallway, they discovered a large black safe which nearly blocked the hallway. Beyond that, they entered a back bedroom and found Suber’s naked and bound body. She had been killed by a single gunshot wound to the head. Examination of the scene revealed a large hole that had been created in the exterior wall of Levron’s attached garage. Once in the garage, the burglars apparently had broken a window and unlocked a door that led into the rest of the home. The officers realized that Levron’s truck was missing. After obtaining a description of the vehicle, the officers disseminated a description of the truck, which was stopped by law enforcement later that evening. There were four occupants inside the truck at that time, including Minter’s brother.
¶ 7. Law enforcement officers eventually determined that Minter, Murphy, Green, and Simmons were the burglars. Although Simmons did not testify at trial, he gave a statement to police prior to trial wherein he claimed that Minter had shot both Levron and Súber. Green gave a similar statement before trial. Pretrial statements also indicated that Minter had sexually assaulted Súber with a pool stick. At trial, Green denied that Minter had sexually assaulted Súber.
¶8. Prior to trial, Green accepted a guilty plea and was sentenced to life imprisonment in return for the State not pursuing the death penalty against him. At his guilty-plea hearing, Green acknowledged that he, Murphy, Minter, and Simmons had broken into Levron’s home. Green stated at the hearing that Minter had fatally shot both Levron and Súber. Murphy pleaded guilty to two counts of manslaughter and was sentenced to two *521 consecutive twenty-year sentences. Both Green and Murphy agreed to testify against Minter as part of their plea agreements.
¶ 9. At trial, Green, Murphy, Crittenden, and various law-enforcement officers testified for the State. Minter did not take the stand, but his mother and stepfather testified that he was at home with them the morning of December 15, 2006. The State offered evidence that Minter’s fingerprints were found on glass left in the doorway between the garage and Levron’s house. Although Murphy’s and Green’s statements and testimonies contained numerous inconsistencies and disparities, both maintained that Minter shot both Levron and Súber.
¶ 10. Minter was convicted of two counts of capital murder and one count of robbery. The circuit court dismissed a sexual-battery charge after Minter requested a peremptory instruction on the charge. He was acquitted of a second sexual-assault count.
¶ 11. Additional facts, as necessary, will be related during our analysis and discussion of the issues.
ANALYSIS AND DISCUSSION OF THE ISSUES

1. Hearsay

¶ 12. Minter contends that Detective Charles Bodie Jr.’s testimony regarding a .880-caliber pistol was improper. Detective Bodie testified that the pistol was recovered from a creek, which had been searched because Minter’s accomplices had told the police that Minter threw Levron’s pistol in the creek. An underwater search team recovered the pistol. After several objections, Detective Bodie testified that the pistol was registered to Levron. We quote at length from Detective Bodie’s testimony regarding the pistol:
Q. As part of your investigation did you also conduct a firearms trace?
A. Yes, it was [sic].
Q. Through what agency would you have conducted that trace?
A. From the ATF, Alcohol, Tobacco and Firearms.
Q. And on what weapon did you conduct a firearms trace?
[OBJECTION]: Your Honor, we’re going to object to this. It’s our understanding that Detective Bodie did not actually conduct this search himself. He had someone conducted [sic] it, and we have been notified that that person would testify. If Detective Bodie, in fact, performed this search himself then fine. You know, they can continue on -with [sic], but he hasn’t answered that part of the question yet.
[COURT]: I don’t think he’s asked that question yet. At this point I’m going to overrule that objection.
[Prosecutor], you’ve asked him only which firearm he requested the trace on.
[PROSECUTOR]: That’s correct, Your Honor.
[COURT]: Detective Bodie, limit your answer to that please, sir.
Q. What firearm did you request a trace be conducted on?
A. The Kel-Tec .380.
Q. And to your knowledge is a firearm identification a regularly kept record of the Alcohol, Tobacco and Firearms agency?
[OBJECTION]: Your Honor, if I may that would be hearsay, and that would be my objection.
*522 [COURT]: It will be overruled on that basis.
* * *
Q. Detective, to your knowledge^] is a firearms registration a regularly kept record of the Alcohol, Tobacco and Firearms agency?
A. Yes, it is.
Q. What was the result of the request that you made of those records?
[OBJECTION]: Judge, same objection, Your Honor.
[COURT]: Come up, counsel.
(A CONFERENCE WAS HELD AT THE BENCH WITH ALL PARTIES.)
* * *
Q. Detective, at your direction did you request a firearms search from ATF?
A. Yes.
Q. Did you receive the results of that trace?
A. Yes, I did.
Q. What type of records would be kept at ATF with regard to firearms?
A. A firearms trace summary.
Q. What information would that typically include?
A. It’s going to be a breakdown of the identifying information of the weapon; the make, model, caliber, serial number, and it will indicate the manufacturer and the distributor and seller and the buyer.
Q. Is that something that they would regularly keep of all firearms purchased?
A. Yes.
Q. And the result that you stated that you received — what was the result of the trace that you stated that you received from ATF?
[OBJECTION]: Objection, Your Honor.
[COURT]: And that basis of your objection ... ?
[DEFENSE ATTORNEY]: It’s hearsay for one. We would not be able to cross-examine any of the records. The records itself [sic] have not been introduced into evidence, and we certainly can’t cross-examine nothing.
[COURT]: That will be overruled on the basis of hearsay. It will be sustained ... with regard to further foundation.
[PROSECUTOR]: If we may approach, Your Honor.
[COURT]: Come on up.
(A CONFERENCE WAS HELD AT THE BENCH WITH ALL PARTIES.)
Q. Detective, where were these records that you say regularly kept [sic], where would they be received from by [sic] ATF?
A. The request would be e-mailed to the ATF, and this is as per directive from our department^] each and every firearm that is received into the department has a firearms trace run on it.
Q. You stated previously that [sic] what some of the types of records that are kept by ATF as part of this[;] what are those records that they keep?
[OBJECTION]: Judge, objection. That’s been asked and answered already.
[COURT]: Overruled.
A. The firearms trace summary will contain the make, model, serial number, [and] caliber of the weapon.
[COURT]: Then it is sustained. That was not the question that he was asked. Re[-]ask your question, [Prosecutor].
*523 Q. Who did they receive — who does ATF receive this information from?
A. At the time it was my assistant.
[OBJECTION]: Judge, we object to that question also. He’s speculating who the ATF receives that from. I don’t think Detective Bodie knows what the ATF — he can [sic] answer that question. He doesn’t have personal knowledge of it. He doesn’t work for the ATF that I know of.
[COURT]: Detective Bodie, if you know what they received you may testify. If you don’t[,] don’t speculate.
Q. Detective Bodie, if I may rephrase my question. The information that is contained in a trace by ATF generally speaking, not the one that you were on that day, where do they obtain that information?
A. From the forms that are sent to them from the dealers at the time of purchase.
Q. That would be the distributors of the firearms, correct?
A. Correct.
Q. And is that something that they maintain as part of their normal business operations?
A. As part of law, yes. As a matter of law, yes.
Q. Again at this time I would ask what were the results of the trace you requested from ATF?
[OBJECTION]: Objection, Your Honor, same objection.
[COURT]: It will be overruled at this time. He can testify with regard to why they maintain it and how they did it.
Q. What were the results of the request that you made in this case?
A. The trace indicated that the original purchaser of the Kel-Tec .380 was Harold Joseph Levron.
Q. What was the date of the purchase on the trace?
A. November 22nd of 2004.
Q. Where was that purchase made?
A. Dad’s Pawn and Gun.
Q. Where is Dad’s Pawn and Gun located?
A. In Gulfport on 25th Avenue.
¶ 13. Circuit courts enjoy considerable discretion when admitting evidence at trial, and we review that decision “under the abuse-of-discretion standard.” Tate v. State, 20 So.3d 623, 632 (¶ 23) (Miss.2009) (quoting Turner v. State, 3 So.3d 742, 744 (¶ 9) (Miss.2009)). Minter contends that Detective Bodie’s testimony about the ownership of the pistol constituted impermissible hearsay.
¶ 14. There is no doubt that the best evidence of what the State sought to prove was the actual trace run by the ATF. Ideally, the documents should have been introduced into evidence rather than paraphrased by Detective Bodie. The contents of such a trace are generally admissible under Rule 803(6) of the Mississippi Rules of Evidence. Because the contents of the trace were most likely admissible, any error in allowing Detective Bodie to testify regarding the result of the trace was harmless. Minter has not introduced any authority to suggest that the trace would have been inadmissible, nor does he contend that Detective Bodie incorrectly summarized the contents of the ATF trace.
¶ 15. Although Minter frames this issue in terms of hearsay, he also argues that Detective Bodie’s testimony violated Minter’s Sixth Amendment right to confront the evidence against him. To violate Minter’s right of confrontation, the hearsay evidence must have been testimo *524 nial in nature. Neal v. State, 15 So.3d 388, 403 (¶34) (Miss.2009) (citing Crawford v. Washington, 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004)). “Testimonial” evidence “applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations....” Id. (quoting Crawford, 541 U.S. at 68, 124 S.Ct. 1354). The Neal court held that “a statement is testimonial when it is given to the police or individuals working in connection with the police for the purpose of prosecuting the accused.” Id. at 404 (¶ 35) (quoting Hobgood v. State, 926 So.2d 847, 852 (¶ 12) (Miss.2006)). Here, the firearms-trace report here was not made for the purpose of prosecuting Minter; rather, it was produced by the ATF to establish the ownership of the pistol that was recovered. The ATF was not attempting to prosecute Minter when it produced the trace report, nor was the report the product of prior testimony or police interrogation. In short, the hearsay evidence did not violate Minter’s Sixth Amendment right to confrontation because the evidence was not testimonial in nature.

2. Green’s Statement

¶ 16. Minter next argues that his right to confront the evidence against him was improperly impinged upon by the circuit court’s limitation of Minter’s use of a statement signed by Green. During questioning outside the presence of the jury, Green stated that he did not write the affidavit; when asked whether he had read it before signing it, he first stated that he had “scanned” it and then stated that he “didn’t even read it.” During questioning by the circuit court, Green stated that the contents of the statement were “true.”
¶ 17. The relevant portions of the statement read as follows:
I[,] Junior Green [,] am aware of my rights and I’m also aware that this document will be -or- could be used against me in a court of law. The circumstances of this case isn’t [sic] as [d]etectives have been lead [sic] to believe. Mr. Larry Minter ... isn’t the individual that shot and killed the deceased party involved in this case, -nor- did he (Mr. Larry Minter) rob, steal -or- take anything from the deceased person(s) involved in this case.
I[,] Junior Green [,] have knowledge of whom [sic] committed these acts[,] and I’m willing to let the proper officials know who was involved in this crime. I just don’t want an innocent man (Mr. Larry Minter) to be found guilty of a crime that he didn’t commit -or- have knowledge of.
Green admitted that he read the second paragraph quoted above before signing the statement. The circuit court ruled that Minter would be allowed to use only the second paragraph at trial. The circuit court reasoned that the second paragraph was the only paragraph that Green admitted to having read before he signed the statement.
¶ 18. We find that the circuit court should not have limited Minter’s use of the statement to the second paragraph above; rather, Minter should have been allowed to question Green about the entirety of the statement. However, the second paragraph clearly alluded to Minter’s innocence when it stated that: “I just don’t want an innocent man (Mr. Larry Minter) to be found guilty of a crime that he didn’t commit -or- have knowledge of.”
¶ 19. Despite the circuit court’s ruling that Minter could use the second paragraph, Minter’s counsel chose not to question Green about the statement during Green’s testimony in front of the jury. Furthermore, the portion of the statement that the circuit court allowed Minter to use was still exculpatory as to Minter. Therefore, we find no prejudicial error requiring reversal.

*525
3. Weight of the Evidence

¶ 20. In his final contention of error, Minter contends that the overwhelming weight of the evidence does not support his convictions. In reviewing the weight of the evidence, “the evidence is weighed in the light most favorable to the verdict.” Williams v. State, 35 So.3d 480, 491 (¶ 41) (Miss.2010) (citing Bush v. State, 895 So.2d 886, 844 (¶ 18) (Miss.2005)). A new trial will be granted only if we find that “the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction [an] unconscionable injustice.” Id. (quoting Bush, 895 So.2d at 844 (¶ 18)).
¶ 21. Minter points to the inconsistencies in Murphy’s and Green’s testimonies, as well as to the fact that both Murphy and Green had taken plea bargains from the State. Minter also notes that Green stated during his testimony that he had lied about parts of his testimony. In addition to attacking the testimonies of his accomplices, Minter complains about the Gulfport Police Department’s investigation of the crime: “There was no testing of a good portion of the physical evidence. There were no shoe[-]print comparisons, and most strikingly, no ballistic evidence offered at all. The matters involving the Mazda truck and the weapon and evidence found inside of it were never explained.”
¶ 22. As to the testimonies of Murphy and Green, the jury heard the inconsistencies in the testimonies. The jury also heard Green’s admission that he had lied; the jury knew that both Green and Murphy had accepted plea bargains in return for testifying against Minter. Despite the inconsistencies, both Green and Murphy remained steadfast in certain parts of their stories: that Levron was killed in the course of a burglary gone wrong, that Súber was killed after she entered the home, that Minter was present during the events in question, and, most importantly, that Minter shot and killed both Levron and Súber. While the police investigation in this case was not perfect, it was adequate. The jury heard all of the evidence in this case, including the inconsistencies and the actions taken or not taken by law enforcement during the investigation of the crime. It is well established that “[t]he jury is the sole judge of the weight of the evidence and the credibility of the witnesses.” Lima v. State, 7 So.3d 903, 910 (¶ 35) (Miss.2009) (quoting Mohr v. State, 584 So.2d 426, 431 (Miss.1991)). Viewing the evidence in the light most favorable to the verdict, we find that allowing Minter’s convictions to stand does not sanction an unconscionable injustice.
¶ 23. THE JUDGMENT OF THE CIRCUIT COURT OF HARRISON COUNTY OF CONVICTION OF CAPITAL MURDER IN COUNTS I AND II AND SENTENCES OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITHOUT THE POSSIBILITY OF PAROLE OR EARLY RELEASE, WITH THE SENTENCE IN COUNT II TO RUN CONCURRENTLY WITH THE SENTENCE IN COUNT I, AND CONVICTION OF ROBBERY IN COUNT VIII AND SENTENCE OF FIFTEEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, TO RUN CONSECUTIVELY TO THE SENTENCES IN COUNTS I AND II, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO HARRISON COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.